Wilmer Gene ROBERTS, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–86–00289–CR.

Court of Appeals of Texas,
El Paso.

Nov. 23, 1988.

Dolph Quijano, Jr., El Paso, for appellant.

Steve W. Simmons, Dist. Atty. of El Paso County, El Paso, for appellee.

Before OSBORN, C.J., and SCHULTE and FULLER, JJ.

## OPINION

OSBORN, Chief Justice.

This is an appeal from a conviction for murder. The jury assessed punishment at sixty years' imprisonment. We affirm.

Point of Error No. One asserts that the evidence was insufficient to support the verdict. The general standard of review for such contention is whether an analysis of the evidence in a light most favorable to the verdict reflects that any rational trier of fact could have found each and every element of the offense beyond a reasonable doubt. *Carlsen v. State*, 654 S.W.2d 444 (Tex.Crim.App.1983). This being a circumstantial evidence case, the proper application of such standard necessitates consideration of whether the evidence excluded every reasonable hypothesis raised by the evidence other than the guilt of the accused. *Martin v. State*, 753 S.W.2d 384 (Tex.Crim.App.1988); *Humason v. State*, 728 S.W.2d 363 (Tex.Crim.App.1987).

The deceased, Apolonia Roberts, was last seen alive on the morning of March 18, 1986, when she dropped off her three children for school. By Appellant's own testimony, his wife returned to their home and picked up some items she intended to sell in Juarez, Mexico. They left together in his 1980 Oldsmobile. At approximately 8:30 a.m., he contended that she dropped him off on Alameda Street at Carpenter's Motors, owned by Bill Emory, a friend and business associate of Appellant. He contended that he never saw her again. She did not pick up the children after school. That night, the children called her sister and a friend for possible information. No one had heard from Apolonia or knew her whereabouts. Appellant exhibited no concern for his wife's safety or whereabouts, his only express interest being in the recovery of the vehicle. Apolonia's sister called both the police and sheriff's department on the night of March 18. Both agencies visited the Roberts' home, but did not pursue the matter when told by Appellant that it was not unusual for his wife to remain away for two or three days. The next day, the sister again called the sheriff's department. Then she,

the Appellant and Monica Roberts (the deceased's elder daughter and Appellant's stepdaughter) drove to Juarez to look for Apolonia and the Oldsmobile. After unsuccessful visits to two law enforcement offices, Appellant, on his own initiative, drove to the "red light" district of Juarez and within a few minutes found the locked Oldsmobile. He gave keys to Monica and told the two women to drive the vehicle back to El Paso. They drove to the sister's home, and she called the police. She was advised to secure the vehicle until they could examine it for fingerprints. The next day, police arrived as Appellant was hooking up the Oldsmobile to a tow-truck borrowed from Carpenter's Motors. Relying on his title to the vehicle, Appellant removed the Oldsmobile without permitting a search. On March 26, 1986, the body of Apolonia Roberts was discovered by two members of the Marine Corps Reserve in the desert area near Las Cruces, New Mexico. She had been severely beaten, sustaining at least ten blows to the head. Cause of death was determined to be trauma to the head caused by blows with a blunt instrument.

There was a significant amount of evidence directly favoring the verdict of the jury. A motive was demonstrated arising from a sexual confrontation between Appellant and his stepdaughter, Monica, two weeks prior to the wife's disappearance. As Monica was emerging from the shower, Appellant approached her and attempted to pull away a towel with which she was covering herself. Monica told her mother, which resulted in a continuous two-week argument between Appellant and the deceased. He allegedly threatened to engage in the same kind of behavior with their younger daughter when she grew older. The deceased purportedly told him to pack up and leave.

When the body was found, it was covered with a throw rug from the den of the Roberts' home, as well as a bedspread which was kept in Appellant's travel trailer behind the house. Appellant had been sleeping there for some time prior to March 18. He alone had the keys to the trailer, which was kept locked. By his own testimony, the trailer exhibited no signs of unauthorized entry. The throw rug was last seen on the morning of March 18.

When police examined the Roberts' home, they found blood throughout the den —on the floor, a plant, walls, doorknobs, door, an ironing board and on a white hand towel. The towel appeared to have been rinsed, and blood under the sofa was smeared by an apparent effort to wipe it up. In fact, investigators testified that the floor area appeared to have been cleaned. When initially questioned, Appellant stated that no one in the household had sustained a bleeding injury.

Appellant was absent during the search of the house. Upon inquiry of his son, he learned that the investigators had discovered apparent blood residue. After his son pointed out the locations, Appellant attempted to clean them up.

At the site where the body was found, a fresh footprint was discovered near the body, apparently made by a large street shoe with a rounded toe. Appellant had a pair of shoes similar in type and size to the footprint. According to his son's testimony, after investigators measured and photographed the shoes, Appellant purchased new ones and threw the others away, with the express intent that they no longer be available to the detectives.

Blood sampling was reviewed in the testimony of Texas Department of Public Safety chemist Dottie Collins. She testified that while samples from both Appellant and the victim were type O, they differed in their Esterase–D enzyme component. Collins analyzed blood samples from an aluminum bar found in the trunk of the vehicle, the rubber edge of the trunk lid, the carpet and carpet backing in the trunk, the den, the bathroom, the bedspread, the throw rug and the white towel. The carpet in the trunk and the throw rug exhibited blood matching that of the victim to three separate enzyme groups. Other samples simply matched in type and/or human origin, with further analysis impossible. Nonetheless, the typing consistencies together with the other evidence in the case

was sufficient to establish beyond a reasonable doubt that the fatal injuries were inflicted in the den at the Roberts' home with the aluminum bar found in the trunk, that the body was wrapped in the rug and bedspread and transported to the desert site in the trunk of the vehicle.

In the separate category of evidence as to credibility of Appellant's depiction of events, we find support not only for the jury's rejection of his denial, but for their rejection of any exculpatory outstanding hypotheses. The conflict between his testimony and that of the other witnesses would justify the jury's conclusions as follows:

(1) He lied as to the denial of the sexual confrontation with Monica;

(2) He lied as to the threat of further behavior of that sort towards the younger daughter;

(3) He lied as to the extent of his wife's anger and her ordering him to leave;

(4) He lied to law enforcement personnel on the day of the disappearance as to his wife's propensity to stay away for several days;

(5) He encouraged his daughter, the following day, to fabricate an unfounded explanation that his wife was away on vacation;

(6) He lied when he first told detectives that no one in the house had been injured; then later tried to connect the bloody towel to a February injury his wife sustained, despite testimony as to his wife's clean habits inconsistent with such bloody towel still remaining out of place in the den.

Appellant attempted to establish an alibi for himself for the morning of March 18. He testified that when his wife dropped him at Carpenter's Motors, it was closed. He roamed Alameda Street for some time, then had breakfast at the Oasis Restaurant, and went back to Carpenter's Motors in the late morning. Employees of the Oasis, very familiar with Appellant, testified that he definitely did not appear there on March 18, or at any time that month. Bill Emory testified that Carpenter's Motors was already open at 8:30 a.m. and that

Appellant arrived on foot, agitated and out of breath, between 11:00 a.m. and noon. The jury had an ample basis to conclude that the alibi testimony was fabricated and could consider murder as the motive for such fabrication.

Appellant's efforts to dispose of his shoes, clean up the blood residue in the home and remove the Oldsmobile from his sister-in-law's house are legitimately to be viewed as efforts to destroy evidence and are logically connected to the earlier efforts at cleaning attempted by the perpetrator, contemporaneously with the commission of the offense.

A lesser order of evidence may be found in Appellant's lack of concern over his wife's safety and whereabouts, his failure to initiate a missing person report, and the ease with which he located the missing vehicle. These factors, too, contribute cumulatively to the propriety of the jury's conclusion.

There was sufficient affirmative evidence offered to negate the existence of motives, place and manner of injury, and identity of the perpetrator, other than those involving the Appellant. There was ample evidence to support the jury's conclusion. Point of Error No. One is overruled.

 In Point of Error No. Two, Appellant complains of the court's inclusion of a parole instruction in the charge to the jury at the punishment stage. *Rose v. State,* 752 S.W.2d 529 (Tex.Crim.App.1988). Appellant did not object to the charge. We acknowledge that such failure to object does not preclude appellate review. We further acknowledge that the majority opinion on rehearing in *Rose,* authored by Judge Campbell, renders the failure to object meaningless in assessing harm from this type of error. The *Rose* opinion on rehearing concluded that such error must be reviewed under Tex.R.App.P. 81(b)(2), and this court should evaluate whether it can be concluded beyond a reasonable doubt that the error did not contribute to the punishment.

Turning to the Rule 81(b)(2) analysis actually employed by Judge Campbell in *Rose*, we find no harm. As in *Rose*, there was an additional curative instruction given in the court's concluding admonitions to the jury. The presumptions arising from such instruction are not assailed in the record before us. Judge Campbell next turned to the facts in the case which militated in favor of the life sentence imposed in *Rose* by the jury. The evidentiary factors in *Rose* which led to a harmless error conclusion are easily matched in the record before us. If there be *any* doubt as to the sentence in this record, it relates to the jury's failure to assess life imprisonment, not the more lenient imposition of sixty years. Point of Error No. Two is overruled.

The judgment is affirmed.