Danny Dean **HUFFMAN**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 08–87–00107–CR.

Court of Appeals of Texas,
El Paso.

April 26, 1989.

Rehearing Denied May 31, 1989.

Gary B. Weiser, Lipson, Dallas & Weiser, P.C., El Paso, for appellant.

Steve W. Simmons, Dist. Atty. of El Paso County, El Paso, for appellee.

Before OSBORN, C.J., and FULLER and WOODARD, JJ.

## OPINION

OSBORN, Chief Justice.

This is an appeal from a conviction for murder. The jury assessed punishment at forty years' imprisonment. We affirm.

In Point of Error No. One, Appellant challenges the sufficiency of the evidence to sustain the conviction. This is a circumstantial evidence case. Accordingly, the appellate standard of review dictates a determination of whether the evidence, viewed in a light most favorable to the verdict, could enable any rational trier of fact to find each and every element of the offense beyond a reasonable doubt. *Carlsen v. State,* 654 S.W.2d 444 (Tex.Crim. App.1983). The proper application of such standard requires that the evidence exclude every *reasonable hypothesis* raised *by the evidence* other than the guilt of the accused. *Martin v. State,* 753 S.W.2d 384 (Tex.Crim.App.1988); *Humason v. State,* 728 S.W.2d 363 (Tex.Crim.App.1987).

The deceased was the eight and one-half month pregnant wife of Appellant. In April 1985, they and their two sons (ages three and two years), moved into a new house in West El Paso, next door to the deceased's sister, Mary Leano, and the latter's husband. On May 22, 1985, the deceased, her mother Carol Varoz and her sister Mary Leano, spent much of the day preparing and hanging curtains in the Huffman residence. Mrs. Varoz left at 3:00 p.m. to pick up her husband. They both returned and stayed for thirty minutes with the Appellant and the deceased before leaving for their own home several miles away. Mary Leano testified that she saw the deceased in her own backyard between 6:00 and 7:10 p.m. when Mrs. Leano left to join her husband at church services. At that time, the deceased was dressed, her hair was arranged, she had makeup on and indicated that she was waiting for the Appellant to arrive. Mrs. Varoz called the Huffman home at 9:30 p.m. When a male voice answered, she asked, "Danny, is that you?" The voice replied, "who ...?" The speaker then hung up. Mrs. Varoz immediately redialed but received no answer. She and her husband then joined another daughter who lived next door to them and watched a movie on television. At 10:30 p.m., Mrs. Varoz again called the Huffman home but received no answer.

Between 6:00 and 6:30 a.m. the following morning, Appellant telephoned Mr. and Mrs. Varoz, Mary Leano and his sister, Susan Huffman Scherr. In each instance, he related that he had left home at approximately 9:00 p.m. to sign some real estate papers at his parents' home. He returned late at approximately 11:45 p.m. The deceased was angry, had packed a blue suitcase and said she was going to her parents' home. Appellant depicted the exchange as a violent verbal argument. He stated that his wife left at midnight in their green two-door Datsun B–210 vehicle, leaving their two sons with Appellant. She did not arrive, and his morning calls were ostensibly made in an effort to locate her.

Members of the family converged on the Huffman residence. They called the police and were advised to inquire at local hospitals and then wait twenty-four hours before filing a missing person report. Mr. and Mrs. Varoz started home along the most likely route which their daughter would have taken. They found her vehicle approximately two miles from the Huffman residence on the shoulder of Redd Road several hundred yards away from a Good Time convenience store. The rear right tire was flat. The blue suitcase could be seen inside the locked vehicle. Mrs. Huffman was nowhere in sight. The police were again called, and Officer Arturo Arzate joined family members at the vehicle. Arzate expressed a desire to enter the vehicle, but Appellant said there was only one set of keys. A short time later, Appellant apparently opened the vehicle with a coat hanger and removed the suitcase. They opened it on the hood of the vehicle. Mrs. Varoz noted various aspects of the contents which disturbed her. The suitcase was neatly packed in a manner uncharacteristic of her daughter. Inside, they found a heavy red quilted robe which Mrs. Varoz had given to her daughter and which the latter disliked as being too hot and uncomfortable. The suitcase contained no underwear, no bras, no makeup and no hairbrush. It did contain a pair of blue non-maternity pants which Mrs. Varoz said were too small for her daughter at her stage of pregnancy. The suitcase also con-tained an unopened box of toothpaste and a new toothbrush. Mrs. Varoz testified that her daughter never brought a toothbrush or toothpaste when staying with her parents. Apparently, the suitcase was closed and placed in the trunk of the Datsun. The vehicle was locked.

The record does not disclose what transpired during the middle of the day. At approximately 2:30 p.m., Detectives Curtis Flynn and Al Giron met with the Appellant at the Datsun on Redd Road. Appellant repeated his version of the events the preceding night. The suitcase was not visible in the vehicle, presumably being in the trunk. Appellant repeated that there was only one set of keys, and further stated that the ignition key was broken off in the ignition. Flynn observed a large quantity of mud and sand on the wheels and lower portion of the vehicle. Appellant stated that such residue was not there when his wife left the night before. Flynn examined the flattened tire, removed it and attempted to inflate it at a nearby gas station. He found a v-shaped puncture in the side wall. In his opinion, the damage was inconsistent with a road hazard and appeared to have been made by a hand tool. Given the size of the hole, the condition of the tire and rim and the appearance of the mud on the tire, Flynn further concluded that the tire was punctured at the site on Redd Road and that the vehicle had not been moved after the tire was punctured. In repeated trips along the route from the Huffman residence, Flynn found no road hazards or rocks which he would have associated with the puncture, and he found no possible sources for the mud and sand.

At approximately 3:40 p.m., the Appellant and Mrs. Varoz were at the site of the Datsun. Two high school students, Scott Pierce and Bobby Roderick, observed the vehicle on its jack and stopped to offer help. Appellant told them his earlier version of his wife's departure. The boys assisted in searching the desert area around the vehicle for one and one-half hours to two hours with no results. Roderick helped Appellant canvass a nearby residential neighborhood again without result.

Both boys testified that Appellant wanted to open the trunk, change the tire and drive the vehicle home. Roderick testified that Appellant said he only had keys to the ignition, doors and gas tank. Both boys testified that he produced a ring with two keys and attempted to open the trunk, breaking a key off in the lock. Later, the trunk was forced open. Both boys saw the blue suitcase in the trunk. Mrs. Varoz specifically asked to reexamine the contents, disturbed by the aforementioned inconsistencies. They went through the suitcase again. Appellant then returned it to the vehicle, changed the tire and drove home. The flat tire was at some point placed in his mother's car.

At approximately 5:00 p.m., members of the sheriff's department, aided by local firefighters, recovered Mrs. Huffman's body from a sandbar in the middle of the Rio Grande River, not very far from the westside area in which Appellant, his parents and the deceased's parents lived and where the vehicle was found. The body was clad only in a pink and white striped dress. One gold earring was found on one ear. The other was missing. The body was removed to the morgue where it was identified by the Appellant at 10:30 p.m. Sheriff's deputies accompanied Appellant to his home and, with his consent, examined the home and vehicle. Appellant tendered the blue suitcase. At that point, it was found to contain a used red toothbrush, a hairbrush and deodorant which Mrs. Varoz testified were definitely not inside on the two prior occasions when she examined the contents. An earring matching the one in the ear of the deceased was found in the garage. The detectives also obtained a set of two keys on a key ring, one key being broken. The coroner had determined from marks on the neck of the deceased that she died as a result of ligature strangulation. The detectives located a belt on the floor near the headboard of the bed in the master bedroom. This was seized and submitted to the F.B.I. along with photographs of the deceased's neck for comparison purposes. The flat tire was retrieved from the Appellant's mother's car. The Datsun was secured in the sheriff's department lot.

Other detectives from the sheriff's office examined both sides of the river upstream from the sandbar where the body was found. They located only one place with significant tire and footprints. Photographs and soil samples were taken. These, together with tire impressions and soil samples from the Datsun, were also submitted to the F.B.I. for analysis.

On June 1, 1985, sheriff's department Sergeant Christopher Miller was called to the area behind the Good Time Store. There, he met the Appellant, his father and his brother-in-law. They related that they had been searching the area for several days and that Appellant had just located the missing keys to the Datsun. They directed Miller to a bush where he observed and seized a ring with two Nissan keys, one broken. On the same day, Appellant's father located, photographed and collected a rock on the roadway between the Appellant's home and the site where the Datsun was found, approximately one mile from the latter. In addition to the foregoing evidence, Police Sergeant Walsh testified that he was the evening shift supervisor for the westside substation on May 22, 1985. He left work at approximately 9:50 p.m., and drove past the Good Time Store en route to his nearby home. Out of habit, he put on his high beam headlights to survey the area around the store. Proceeding up Redd Road, he observed the green two-door Datsun B-210 on the shoulder at the site where it was later found. He observed no one in or around the vehicle. According to his testimony, it was there before 10:00 p.m.

The results of the expert examination of the physical evidence were, for the most part, inconclusive. Soil samples from the riverbank could not be associated with the mud and sand on the vehicle. Three of the tires were definitely excluded as sources of the tracks left beside the river. The right rear tire (actually the spare) could have produced such marks, but not to the exclusion of all other sources. Twenty-one finger and palm prints of evidentiary value

were located on the interior and exterior surfaces of the vehicle. All interior prints were traced to either family members or others assisting in the investigation. Two fingerprints and a combined palm print and fingerprint from the exterior were never identified. F.B.I. Agent Hallett testified that the belt bore six points of comparison with the marks on the deceased's neck. While it could have produced the injuries, he could not exclude other similar sources. The belt bore no peculiar characteristics as a result of manufacture or wear and tear. Contrary to Flynn's opinion, another F.B.I. analyst concluded in a written report that abrasions surrounding the tire puncture were inconsistent with causation attributable to a hand tool, and that road hazard could not be excluded.

One additional area of evidence was presented through the testimony of Linda Holguin, discussed further in a separate point of error. Holguin testified that she had worked as a waitress at the Seafood Galley Restaurant. In early June 1985, the Appellant, his sister Susan Scherr and her daughter, Rhaelynne, came in for lunch. According to Holguin, Susan Scherr asked if she was married. When she replied in the affirmative, Appellant stated words to the effect that that was "too bad" and that he was recently widowed. Holguin expressed her condolences and asked what had happened. Appellant and his sister answered concurrently, she referring to news coverage about a woman "trying to swim down the river", and he stating that his wife was the person recently reported found in the Rio Grande. Holguin testified that they were laughing and joking throughout. She expressly discounted what they were saying due to their demeanor, but received their affirmation that it was true. Later, Appellant asked if she knew anyone who wanted two boys. He stated that he had two that he wanted to "get rid of" and would "give them away" or sell them "real cheap."

The defense's approach to the trial focused upon the circumstantial nature of the evidence and inconclusive results of the investigation. Several defense witnesses portrayed Appellant's happiness with the marriage and forthcoming birth. His sister, Susan, and his niece denied the restaurant incident described by Holguin. Susan Scherr testified that she received a telephone call from the deceased at 11:30 p.m., May 22, 1985. The deceased was trying to locate the Appellant. Appellant told her the next morning that he arrived home late at 11:45 p.m., that they then argued and the deceased left at midnight with the previously packed suitcase.

In an effort to raise exculpatory hypotheses, the defense offered testimony from Good Time Store's clerk, Carl Roe, that a pregnant woman had entered the store that evening, purchased gas and then drove away. Defense inquiry further depicted other crimes happening in that area around the time of Mrs. Huffman's death.

■ The foregoing recitation is, to say the least, a brief summary of the evidence presented in over two thousand pages of testimony. It does, however, present the salient and dispositive aspects of the evidence for purposes of determining the sufficiency of the evidence. We begin with a preliminary highlighting of the doctrines associated with circumstantial evidence review. *Carlsen, Humason* and *Martin* have already been cited for the general standard of review applicable in circumstantial cases. In addition, we note that such cases must be evaluated on an individual basis. *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Crim.App.1977). The evidence is to be considered not only for its elemental contribution to the verdict, but for the force and effect of its cumulative implication. *Vaughn v. State,* 607 S.W.2d 914, 921 (Tex.Crim.App.1980). In negating hypothesis other than the guilt of the accused, such disproof need not rise to a level of moral certainty, and need not address hypotheses which are unreasonable or not raised by the evidence. *Id.; Flores,* 551 S.W.2d at 367. The negation concluded by the jury verdict is proper and the evidence sufficient to support conviction if the profferred defensive theory is out of harmony with evidence tendered by the State and subject to credit by the jury.

As a matter of analytical house-cleaning, we turn first to Appellant's attempt to raise *specific* hypotheses inconsistent with his guilt. In each case, the cornerstone facts are the victim's departure from the household, alive, at midnight in the Datsun B–210, leaving the Appellant behind. First is the evidence of the store clerk, Carl Roe, that a pregnant woman did enter his store on the night of May 22, 1985. The jury could reasonably negate this suggestion that this was Mrs. Huffman on three bases. He testified that the woman entered his store before the 11:00 p.m. shift change. All defensive versions of Mrs. Huffman's final departure, originating with Appellant, have her leaving the house at midnight. Mrs. Huffman left wearing a pink and white striped dress. This was still on her body when it was found in the river the following day. The woman observed by Roe was wearing a solid pink top. Roe's customer arrived and departed in an operable vehicle, after purchasing gas and sodas she did not appear agitated. Such behavior was inconsistent with the circumstances of Mrs. Huffman's departure, her destination and the injury to the vehicle.

Next, we have Roe's testimony concerning the suspicious behavior of three males in a brown station wagon, tentatively connected to an assault and robbery on a male subject several miles away the next day. In general, this evidence was not sufficiently connected to the facts in this case to give rise to a specific, reasonable, exculpatory hypothesis. As pointed out by the State, this amounts to no more affirmative proof of a specific perpetrator, other than Appellant, than abstract recognition that violent assaults had occurred in West El Paso, were occurring at that time in 1985 and have occurred since then. The occupants of the station wagon appeared at the store at 4:00 a.m., May 23, four hours after Appellant indicated his wife left the house and six hours after her vehicle was seen near the store by Sergeant Walsh. Their behavior at the store was not criminal in nature. There is no adequate evidentiary connection to support a jury conclusion that they were the ones who attacked one Victor Ramirez the next day. Whoever attacked Victor Ramirez did so with a knife. There was no indication of knife injuries to Mrs. Huffman.

For the same reasons, the evidentiary references to the kidnapping case involving Jose Ordonez gave rise to no reasonable hypothesis of his connection to Mrs. Huffman's murder. His fingerprints were compared to those found on the vehicle with no match.

This leaves only the general defensive approach that the circumstantial evidence did not negate commission of the murder by some person unknown. Again, however, the predicate findings for such an exculpatory hypothesis are Mrs. Huffman's departure at the time and in the mode repeatedly stated by Appellant.

The defense attempted to raise additional questions with regard to possible subsequent events, but in each instance, there was some evidence which, if believed by the jury, would negate the defensive suggestion. Appellant's father testified as to irrigation of his property on May 19 and the subsequent visit of his son and daughter-in-law in their Datsun. This was apparently offered to suggest an innocent source for the mud on the vehicle. The jury, however, was free to reject this evidence in favor of Detective Flynn's testimony that when he pointed out the mud to Appellant on the afternoon of May 23, the latter stated that it was not on the vehicle when his wife departed the previous night. The jury was also free to conclude that Flynn was correct in stating that there were no mud sources along the route traveled by the deceased between her home and the site where the car was found. A reasonable inference did remain, however, that such mud was associated with the placement of the body in the river, whether the site located by Detective Medellin was the actual deposit site or not.

Did the victim experience a flat tire en route to her parents' house, exit the vehicle and then encounter her murderer? Despite the F.B.I. conclusions and the opinion of defense expert, Karl Johnson, the jury was free to accept the opinions of Detective

Flynn concerning the tire damage. A sufficient predicate of expertise was presented to support the admission of such opinions and no present point of error challenges their admissibility. Flynn concluded that the location and conformation of the puncture was inconsistent with a road hazard and indicative of intentional puncture with a hand tool. He further testified that, given the condition of the undisturbed mud on the tire and the absence of significant other damage to the tire and rim, the vehicle had not been driven after the puncture occurred. In other words, the vehicle was stopped at its ultimate destination and the tire punctured. As for the rock located ten days later by Appellant's father, the jury could properly accept Flynn's factual testimony that he observed no such rock on his repeated trips along that route. They could further accept his opinion that such rock was not consistent with the damage to the tire. They could further accept his opinion that the distance from the rock to the site of the vehicle negated its contribution to the puncture. The volume of air loss from such puncture and the one mile distance between the two sites would mean that the tire would have to have been driven a considerable distance completely flat, with significant attendant damage to both tire and rim. No such damage was present. In short, the jury could reasonably conclude that the injury to the tire and the positioning of the vehicle were acts of subterfuge intended to obscure the true sequence of events surrounding Mrs. Huffman's death. In itself, this factual conclusion negates a wide range of hypotheses exculpatory to the Appellant.

█ This case, in fact, turns as much upon evidence of subterfuge as upon other evidence of guilt. Evidence of subterfuge, if believed to be such by the jury, serves not only to negate attempted exculpatory hypotheses, but also by its inherent connection to motive and sense of guilt, may provide affirmative evidence of culpability on the part of the one to whom such subterfuge is attributable. *Vaughn; Roberts v. State*, 763 S.W.2d 443 (Tex.App.—El Paso 1988, pet. filed). Flight, rebutted alibis, destruction of evidence and fabrication of evidence are but a few samples of incriminating behavior.

In this case, the record disclosed a "violent, verbal argument" as a reasonable motivational presage to murder. Appellant was the last person known to have seen his wife alive. In essence, his defense is a species of alibi—not, as in *Roberts*, placing himself elsewhere at the time of the murder, but in fact placing his wife elsewhere at the fatal moment. Critical to this defensive posture and all exculpatory hypotheses is his wife's departure as repeatedly described by him to other witnesses. This Court, in its appellate oversight function, must consider the evidence which negates such a defensive posture, as the jury presumably did in its fact finding capacity.

As to time of departure, the jury could reasonably conclude, from Sergeant Walsh's testimony, that the Datsun was already in place at Redd Road prior to 10:00 p.m.—two hours before the departure time stated by Appellant. Given Appellant's repeated version of his wife's departure and the testimony of Susan Scherr, the jury was therefore free to reasonably conclude that Appellant was lying about the time of departure by two hours. Coupled with a reasonable conclusion that the vehicle was positioned and the tire punctured for purposes of deception, the cumulative inferential conclusion is fatal.

If that were not enough, there is the significance of the suitcase and its contents. Appellant's various recitals clearly indicated that the deceased packed the suitcase prior to his return home and her departure. As subsequently disclosed, however, the contents were significant in two respects. The jury could reasonably accept as fact that the contents were so inconsistent with Mrs. Huffman's character and pregnant condition that she did not in fact pack the suitcase. Of even further significance is that after Mrs. Varoz specifically requested an opportunity to reexamine the contents and after Appellant removed the suitcase to the privacy of his home, the contents were apparently augmented with additional items not present during the first two examinations. Based upon this

testimony, the jury could reasonably conclude that Appellant packed the suitcase initially and that he added to the contents after realizing that the initial contents had attracted suspicious attention.

Thus, the jury has sufficient credible evidence to conclude that Appellant lied about the time of his wife's departure, that he lied about her having packed her suitcase for a voluntary departure and that he altered the evidence in his possession prior to police seizure. Applying the language from *Vaughn* and *Flores,* there is no *reasonable* exculpatory hypothesis *raised by the evidence* which is harmonious with such legitimate factual conclusion by the jury. What is harmonious is that Appellant returned home prior to 10:00 p.m. He and his wife engaged in what he himself termed a violent verbal argument. He had access to a weapon, the belt, which although not proven conclusively to have been the murder weapon, gave him the capacity to inflict the fatal injuries analyzed by Dr. Contin and Agent Hallett. He killed his wife with the belt. He conceived of a reverse alibi in which she departs alive for her parents' home, experiences the flat tire, exits the vehicle, is waylaid, murdered and deposited in the river. To carry out the necessary movements to support this concoction—packing the suitcase, depositing the body in the river, positioning the vehicle, puncturing the tire and returning home—he needs additional time. Hence, the first fabrication—his wife's departure at midnight.

These three areas—(1) time of departure, (2) the injury to the tire and arrival of the Datsun at Redd Road; and (3) the suitcase and its contents—are areas in which the jury could directly conclude that there was intentional fabrication. With the first and third, they could directly attribute the fabrication to Appellant. It would be unreasonable for them to so conclude and then attribute the second area of fabrication to some unknown perpetrator. All three areas are perfectly consistent with Appellant's guilt, taken individually or cumulatively. The first and third are inconsistent with anyone else's guilt, as is the second when cumulatively considered. That meets the appellate test for sufficiency of the evidence in a circumstantial case. While other evidentiary matters such as Appellant's inconsistent statements as to the car keys, his fortuitous finding of the victim's missing keys and the restaurant incident depicted by Linda Holguin provide further circumstantial support, we find the aforementioned three areas of deception sufficient to support the verdict. Together with the other evidence, they permitted the jury to determine motive, opportunity as to time, place and manner of commission, as well as sense of guilt and effort to avoid responsibility—all to the logical exclusion of any other perpetrator.

The State has properly compared the evidence in this case to that found sufficient in *Roberts*. *Roberts* was a marginally stronger case for conviction, but in fact presents the same pattern of circumstantial evidentiary development—motivation, opportunity, deception by destruction or falsification of evidence, deception by attempted alibi, fortuitous finding of the victim's missing vehicle by the defendant and lack of concern over the well-being of the missing wife. In both cases, the cumulative force and effect of the evidence and the direct factual findings ripe for jury conclusion inescapably establish the defendant's guilt and negate a reasonable doubt as to commission by some other party. Point of Error No. One is overruled.

 In Point of Error No. Two, Appellant alleges a fatal variance between pleading and proof. The indictment alleged ligature strangulation by manner and means unknown to the grand jury. Appellant contends that the variance is fatal because of the State's effort to prove the use of the belt as the deadly ligature and because the grand jury foreman, Francis Daugherty, testified that the grand jury did not utilize due diligence to determine the manner and means of strangulation. Appellant correctly asserts that such pleading requires the State to establish that the manner and means of commission of the offense was unknown to the grand jury and could not have been ascertained by them through the exercise of due diligence. *Jordan v. State,*

520 S.W.2d 388 (Tex.Crim.App.1975). If the evidence at trial does not show what type of instrument was used, then a prima facie satisfaction of such burden exists. *Scott v. State,* 732 S.W.2d 354 (Tex.Crim. App.1987). If the evidence does reflect the weapon used, then the State must actively proceed with proof of lack of grand jury knowledge and the use of due diligence in their investigation. *Washington v. State,* 677 S.W.2d 142, 145 (Tex.App.—Dallas 1984, no pet.). Failure to meet that burden amounts to a fatal variance between pleading and proof, necessitating reversal.

This is essentially an evidentiary review question. Testimony of the grand jury foreman is but one element of the evidence to be assessed. Despite his conclusory assertion in this case that due diligence was not exercised, the other expert evidence in the case clearly establishes that no further investigation by the grand jury could have established the actual murder weapon with greater certainty. The testimony of Dr. Contin and F.B.I. Agent Hallett produced the same degree of inevitable uncertainty as in *Simon v. State,* 488 S.W.2d 439, 443, 444 (Tex.Crim.App.1972) and *Brown v. State,* 704 S.W.2d 506, 508 (Tex.App.—Dallas 1986, PDRR). In both cases, the appellate courts ruled that no fatal variance was created. Point of Error No. Two is overruled.

■ Point of Error No. Three challenges the admissibility of the testimony of Linda Holguin, recited above. Contrary to the State's brief, Appellant did lodge a timely objection as to relevancy which was expressly overruled by the trial judge. Tex.Penal Code Ann. sec. 19.06 (Vernon 1989), extends the relevant scope of inquiry in a murder case to all facts bearing upon the relationship between the accused and the deceased, as well as the condition of the mind of the accused at the time of the offense. Even declarations by the accused after the commission of the offense are admissible to the extent that they demonstrate malice, motive or the state of mind of the defendant. *Gentry v. State,* 172 Tex.Crim. 345, 356 S.W.2d 793, 795 (App. 1962).

In *Reese v. State,* 142 Tex.Crim. 254, 151 S.W.2d 828, 836 (App.1941), the Court of Criminal Appeals held that proof of the deceased's advanced state of pregnancy was admissible in a prosecution of the father for murder. Imminence of childbirth was considered by the Court to be a circumstance showing motive. If so, it can only be as an implicit indicator of a state of mind seeking to avoid the parental relationship. The same is certainly true in this case. The degree to which such motive and state of mind may have existed with regard to Appellant was properly buttressed by the callous, joking postmortem references to his deceased wife and his repeated expressions of a desire to divest himself of the two sons. Point of Error No. Three is overruled.

■ Appellant's final point of error challenges the parole instruction delivered to the jury under Tex.Code Crim.Pro.Ann. art. 37.07, sec. 4 (Vernon Supp.1989). At the outset, we note that this charge was delivered on March 5, 1987. At that time, the Fifth Court of Appeals in Dallas had issued on January 7, 1987, an en banc decision declaring the instruction constitutional. *Rose v. State,* 724 S.W.2d 832 (Tex. App.—Dallas 1987). It was not declared unconstitutional until the original opinion and rehearing opinion of the Court of Criminal Appeals, respectively issued on November 12, 1987, and June 15, 1988. *Rose v. State,* 752 S.W.2d 529 (Tex.Crim.App.1988). As pointed out in Justice McCormick's dissent to the original *Rose* opinion, twelve courts of appeals had declared the instruction constitutional, including this Court. The Tyler and Eastland Courts of Appeals had expressed no opinion. As suggested in Justice Campbell's opinion on rehearing in *Rose,* an exception exists to the general rule that an unconstitutional statute is void ab initio. *Rose v. State,* 752 S.W.2d at 553, n. 4. Here, the trial judge and the State relied upon a statute initially presumed to be constitutionally sound. Furthermore, twelve courts of appeals, including the court of appeals to which the conviction would pass, had already expressly rejected constitutional challenges to the statute.

There is an ample basis for applying the exception in this case and not extending the ultimate *Rose* doctrine to this prior trial court action.

We further note that, as reflected in the concurring opinion of Justice Miller and the dissenting opinion of Justice Clinton in *Stevenson v. State*, 751 S.W.2d 508, 509, 511 (Tex.Crim.App.1988), retroactive application of a judicial decision is not mandated by either the United States or Texas Constitutions. See e.g. *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) (exclusionary rule); *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) (limiting retroactivity of *Escobedo* and *Miranda* rights); *Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (limiting the *Katz* doctrine to prospective application). If matters of Fourth and Fifth Amendment significance are subject to limitation on their retroactive application, surely the same is true with regard to the *Rose* issue. In deference to the Court of Criminal Appeals, a decision of blanket non-retroactivity should originate with that Court. The background of the *Rose* controversy should militate in favor of such a decision. Until such time, however, this Court deems it appropriate to consider and apply non-retroactivity on a case-by-case basis under the reliance theory suggested by Justice Campbell.

Furthermore, applying the standard of Tex.R.App.P. 81(b)(2) to the present case in the manner adopted on rehearing in *Rose*, we would not in any event find the instruction error in this case reversible. In *Rose*, a maximum sentence was still susceptible to affirmance upon three factors identified by Justice Campbell—(1) the prior record of the defendant, (2) the prohibition of parole consideration in the jury instruction; and (3) the heinous nature of the offense. In the present case, the jury assessed punishment at forty years' imprisonment. Appellant had no prior record. The instructions, while not containing the second prohibition identified in *Rose*, did follow the statutory prohibition advising the jury not to consider the actual effect of parole laws upon the sentence to be imposed. We presume, in the absence of new trial evidence to the contrary, that the jury adhered to the instructions. *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Crim.App.1983). Finally, the nature of the murder in this case, the callous treatment of the body of the deceased and the efforts to avoid responsibility make the record in *Rose* seem mild by comparison. We find beyond a reasonable doubt that the parole instruction did not harmfully contribute to the sentence. Point of Error No. Four is overruled.

The judgment is hereby affirmed.