Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


## MEMORANDUM OPINION

No. 04-10-00516-CR

Forest **HOLMES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2009-CR-9830
Honorable Raymond Angelini, Judge Presiding

Opinion by:   Phylis J. Speedlin, Justice

Sitting:   Catherine Stone, Chief Justice
Phylis J. Speedlin, Justice
Marialyn Barnard, Justice

Delivered and Filed:   September 14, 2011

AFFIRMED

Appellant Forest Holmes appeals his murder conviction, asserting the evidence is legally insufficient to prove he was the perpetrator and that he had the requisite intent. We affirm the trial court's judgment.

### BACKGROUND

On September 5, 2006, Lynn Derrick Williams' body was found in an alley at Oldham Street in the Camelot 2 subdivision in San Antonio, Texas. Williams had suffered a fatal

gunshot wound to the back right side of his head.  His pockets were turned inside out and his shoes were missing.  The responding officer, Deputy Harry Chomorro, believed that Williams had been robbed.  However, because Williams was still holding an intact cigar in one hand, the officer did not believe there had been a struggle.  Williams' shoes were found in a nearby carport; a small piece of dark glass similar to the glass in the alley near Williams' body was found inside one of the shoes.  Williams had cocaine in his system at the time of his death.

Three years later, appellant Forest Holmes was indicted for Williams' murder.  The State filed a notice of intent to enhance punishment for the instant offense based on a prior felony conviction.  After a jury trial, Holmes was found guilty of murder.  After the jury found the alleged enhancement to be "true" and recommended a 99-year sentence, the trial court sentenced Holmes to imprisonment for ninety-nine (99) years in the Texas Department of Criminal Justice-Institutional Division and assessed a $10,000 fine.  Holmes now appeals.

**ANALYSIS**

In his sole issue on appeal, Holmes contends the evidence is legally insufficient to prove his identity as the person who shot Williams, and to prove he had the required intent to commit murder.  Under the legal sufficiency standard, we review all the evidence and reasonable inferences in the light most favorable to the jury's verdict, and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).  It is the jury's role to resolve conflicts in the testimony, assess credibility, and weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. *Brooks*, 323 S.W.3d at 899.  In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony; we

may not substitute our own judgment for that of the jury. *Id.*; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Further, we must resolve any inconsistencies in the evidence in favor of the jury's verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

Paragraph A of the indictment charged that Holmes intentionally and knowingly caused Williams' death by shooting him with a deadly weapon, namely, a firearm; alternatively, Paragraph B charged that, with intent to cause serious bodily injury, Holmes committed an act clearly dangerous to human life that caused the death of Williams, by shooting Williams with a deadly weapon, namely a firearm. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) & (2) (West 2011). The jury was instructed to find Holmes guilty of murder if they found beyond a reasonable doubt that Holmes committed murder by either alternate means, i.e., that Holmes intended to kill Williams by shooting him, or that Holmes intended to cause Williams serious bodily injury and shot him, resulting in his death. *See Garcia v. State*, 246 S.W.3d 121, 141 (Tex. App.—San Antonio 2007, pet. ref'd) (section 19.02(b)(1) requiring mental state of intentionally or knowingly and section 19.02(b)(2) requiring intentional conduct constitute alternative manners or means of committing the offense of murder). The jury rendered a general verdict finding Holmes guilty of murder. The jury's verdict may be upheld if there is legally sufficient evidence to support a finding under either of the theories submitted. *See Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991); *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Crim. App. 1987) (opin. on reh'g). On appeal, Holmes asserts there is "no evidence" to support the jury's findings that (i) he was the person who murdered Williams, and (ii) he had the requisite intent under either theory submitted to the jury.

*Identity*

Even though Holmes made several non-custodial out-of-court statements to different people admitting that he shot and killed Williams, and there is physical evidence to corroborate his extrajudicial admissions, Holmes contends the evidence is legally insufficient to prove he was the perpetrator. Specifically, Holmes asserts the State's two main witnesses, Michelle De La Pena and Coralie Williams, who testified about Holmes' admission, were inherently unreliable and gave inconsistent testimony. The identity of the accused as the perpetrator is always an essential element of the charged offense. *Jaubert v. State*, 74 S.W.3d 1, 12 (Tex. Crim. App. 2002).

At trial, Michelle De La Pena testified she had an intimate relationship with Williams and allowed him to stay at her house; she called him by his nickname "D." She knew that Williams sold drugs to support himself and often got into money trouble because he tended to use the drugs instead of selling them. A few days before Williams' death, a group of men came into De La Pena's house and badly beat Williams because he owed them money; they also ransacked her house and stole items to satisfy some of Williams' debts; appellant Holmes was not part of the group.

On the day Williams died, De La Pena stated she was present when Williams asked his mother for money, and "as soon as his mom gave him the money, he went walking around the neighborhood showing the money off." Holmes was at De La Pena's house that afternoon, and she and Holmes went out looking for Williams. When they found him, De La Pena had a conversation with Williams about the money in the presence of Holmes. The three of them returned to De La Pena's house as it was getting dark. While at the house, De La Pena observed either Ree Ree or "T," two other men who were at the house, hand Holmes a gun. Before

Holmes and Williams left the house together, Ree Ree had a conversation with Williams saying, "you're about to leave the pen and y'all about to go make this happen, you're about to go make some money and he's gonna make sure that you do it." De La Pena stated she was scared for Williams, but did not have a chance to talk to him before he left with Holmes.

De La Pena testified that after about five or ten minutes, Holmes returned to her house alone. Holmes appeared "all sweaty and like he had been running and he was frustrated like he was – moving fast, making quick movements." When she asked him where Williams was, Holmes stated, "he's assassinated," and made a gesture with his hand across his throat. De La Pena responded, "What?" Holmes replied, "I assassinated the motherf*cker." De La Pena exclaimed, "What do you mean?" Holmes explained, "[w]e were struggling, put my arm around his neck, he – D got away, he ran away, I called D's name, D turned around and looked at me, he looked scared and I shot him in the back of the head." De La Pena testified there was a lot of commotion at that time, but she saw Holmes give the gun to "T." Holmes also changed into a different shirt someone had brought him, and washed his hands with bleach in her kitchen. Holmes also asked De La Pena "where the money was," and stated, "I took off his shoes, I searched his pockets, I shook him down, he didn't have any money."

Coralie Williams[1] testified that she knew both Lynn Derrick "D" Williams and Forest Holmes "pretty well" in September 2006, and Holmes "was like a big brother to me." On the day "D" died, he visited Coralie at her house on Oldham Street between 3:00 and 4:00 p.m. "D" appeared upset, "a little bit nervous," and "a little bit wound up." While "D" was inside Coralie's house, she saw Holmes and three other males standing outside on the street in front of her house. When "D" left, Holmes made eye contact with Coralie from the street and began to

---

[1] The record shows no relation between Coralie Williams and the deceased, Lynn Derrick Williams. To avoid confusion, the parties' first names will be used in this section.

walk in the same direction as "D" before turning and walking away in the other direction. Coralie testified she "felt like something was going on between them, like there was anger and hostility between them" based on her knowledge of both men.

Later that night between 9:00 and 10:00 p.m., Coralie left her house to walk to a friend's house one block over. As she cut through the alley from Oldham Street, she heard people arguing; she looked around the corner, and saw that it was "D" and Holmes arguing "about money and drugs." Coralie could see "D"'s face because he was turned toward her and the light was shining; she knew the other man with his back to her was Holmes "from the shape of his head, the way he stands, his shoulder [sic], the way he talks." As they argued, Coralie saw Holmes pull out a gun and point it at "D"'s head. She turned and began running away; shortly thereafter, she heard a gunshot. Coralie was "upset" and "very scared," but proceeded to go meet her boyfriend for a drink at a neighborhood bar. She left the bar at about 10:50 p.m., and as she was walking home she saw Holmes, Ree Ree, and Michelle De La Pena standing in front of De La Pena's house. It would have been unusual for Coralie not to talk to Holmes, so she stopped. Holmes was acting "paranoid," "sweating," and "couldn't stay still." Holmes told Coralie, "I shot Lynn Derrick; I shot D." Holmes also stated that he shot him in the back of the head and left his body in the alley.

In addition to the above testimony, Ashley Pine, with whom Holmes was living in Edna, Texas at the time of his arrest in 2009, testified that Holmes also made an admission to her on the day he was questioned about Williams' murder. Pine testified that Holmes told her, "I was supposed to have robbed him for drugs and money and that I was gonna take whatever was left and he kept calling my name and I told him three times and I hit him in the back of the head with

the gun and the gun went off." Holmes did not mention the victim's name and stated the incident occurred in June; Williams was in fact killed in September of 2006.

Finally, photographs of the murder scene were admitted showing that "D" Williams was shot once in the back of the head, his pockets were empty and turned out, and his shoes were missing. In addition, Williams was still holding an intact cigar in one of his hands. A pair of white tennis shoes was recovered from a nearby carport, and one shoe contained a small piece of dark glass like the glass found near the body in the alley. The medical examiner testified that a gunshot wound to the back of the head was the cause of Williams' death.

Holmes contends that De La Pena was not credible due to her bad character because she was involved with Williams and allowed him to live at her house even though she knew he used drugs and sold drugs and owed people money; further, at the time of the murder she had lost custody of her five children to Child Protective Services. Holmes also points to De La Pena's testimony that Williams owed a lot of people money in the neighborhood as creating a reasonable doubt that the killer was Holmes, instead of someone else to whom Williams was indebted. As to Coralie Williams' credibility, Holmes argues she was "unreliable and unbelievable" because her trial testimony was both internally inconsistent and inconsistent with her two prior statements to police. Holmes cites the internal conflicts between (i) Coralie's testimony that she was 10 to 15 feet away from the men arguing in the alley and Deputy Chomorro's estimate that the distance was 50 to 100 feet, (ii) Coralie's testimony that there were no lights in the alley, but that a light was shining on Williams' face, (iii) her "confused" testimony about whether she heard Holmes' voice during the argument, and (iv) her testimony that she was "terrified" by what she had witnessed, yet she went out with her boyfriend afterward instead of reporting the shooting to the police, saying it was fairly common to see guns and

shootings in the neighborhood. Holmes also points to the contradictions between Coralie's testimony and her two prior statements to police, noting that in her initial 2006 statement Coralie only said she saw the men arguing and did not mention seeing a gun or hearing a gunshot, and in her 2009 statement she said she saw Holmes shoot Williams but admitted at trial that she did not actually see the shooting but only heard the gunshot. Finally, Holmes asserts Coralie was not credible due to her bad character because she let "D," who she knew as a drug dealer, into her home where her child lived.

As discussed, *supra*, it is the jury's role to assess the witnesses' demeanor and credibility and they may choose to believe all, part, or none of a witness's testimony. *Brooks*, 323 S.W.3d at 899. It is also the jury's role to resolve any inconsistencies in the evidence, and on appeal we must presume the jury resolved such inconsistencies in favor of their verdict. *Id.*; *Curry*, 30 S.W.3d at 406. Here, not only did the jury hear the testimony of Michelle De La Pena and Coralie Williams reciting Holmes' statements admitting he killed Williams by shooting him in the back of the head, they also heard Ashley Pine's testimony that, shortly after he was questioned about Williams' murder, Holmes told her about an attempted robbery during which he hit the victim in the back of the head, causing the gun to discharge.

In addition, the physical evidence and the responding officers' testimony about the condition of Williams' body corroborate the details of Holmes' admissions in that (i) Williams was shot in the back of the head, as Holmes described to De La Pena and Coralie, (ii) Williams suffered a single gunshot wound, as Holmes described firing one shot and as Coralie heard only one gunshot, (iii) Williams' pockets were turned out and his shoes were removed, as Holmes described to De La Pena, (iv) Williams' body was left in the alley, as Holmes described to Coralie, (v) Holmes was seen with a gun by both De La Pena and Coralie prior to the shooting

and appeared "sweaty," and nervous after the shooting, and (vi) Williams was shot in the back of the head, as Holmes described to Pine that he hit the victim in the back of the head, causing the gun to discharge. In addition, De La Pena identified the recovered shoes as belonging to Williams, and glass matching that around his body was found inside a shoe. Deputy Chomorro testified to his opinion that Williams' shooting was part of a robbery, which corroborated Holmes' statements to De La Pena and Pine that he was looking for money on Williams' body and he intended to rob the victim. Viewing the evidence in the light most favorable to the jury's verdict, we conclude it is legally sufficient to prove Holmes' identity as the person who shot and killed Williams.

*Culpable Mental State*

Holmes also asserts the evidence is legally insufficient to prove he had the requisite intent to support his murder conviction because he told Ashley Pine that he hit the victim on the head and the gun accidentally discharged. This defense theory was submitted to the jury in the form of a lesser-included offense instruction permitting the jury to find Holmes guilty of the lesser offense of manslaughter if they believed he recklessly caused Williams' death by hitting him on the head, causing the gun to discharge. *See* TEX. PENAL CODE ANN. § 19.04 (West 2011). The jury rejected this theory of events, however, and instead found Holmes guilty of murder.

As noted, *supra*, Holmes was charged with committing murder under alternate culpable mental states, and the jury was instructed to find Holmes guilty if it found he committed murder under either theory. We conclude the evidence is legally sufficient to support the jury's finding that Holmes had one of the culpable mental states required for murder as charged in the indictment, i.e., that he either intended to kill Williams by shooting him, or intended to cause Williams serious bodily injury and shot him, thereby causing his death. *See Garcia*, 246 S.W.3d

at 141 (jurors need only agree that defendant possessed one of the alternate mental states alleged under section 19.02(b)(1) and (2), they need not all agree on which specific mental state). First, Holmes himself used the term "assassinated" when he told De La Pena he killed Williams, which suggests that Holmes intended to kill, not merely wound, Williams when he shot him. *See* BLACK'S LAW DICTIONARY 122 (8th ed. 2004) (an "assassination" is "the act of deliberately killing someone"). In addition, Holmes made a throat-slicing motion to illustrate the "assassination" as he described it to De La Pena, which also creates an inference that Holmes' killing of Williams was knowing and intentional. Second, the fact that Holmes changed shirts and washed his hands with bleach in an attempt to destroy or cover-up evidence of the shooting shows a consciousness of guilt and is probative of intent. *See Martin v. State*, 151 S.W.3d 236, 244 n.6 (Tex. App.—Texarkana 2004, pet. ref'd) (it is well-established principle that defendant's destruction of evidence is probative of guilt); *see also Huffman v. State*, 775 S.W.2d 653, 660 (Tex. App.—El Paso 1989, pet. ref'd) (evidence of subterfuge, including destruction of evidence, may provide affirmative evidence of culpability). Third, all of Holmes' admissions to De La Pena and Coralie were affirmative statements that he intentionally shot Williams – "I assassinated the motherf*cker;" "D turned around and looked at me, he looked scared and I shot him in the back of the head;" and "I shot Lynn Derrick;" "I shot D." These admissions made on the night of the murder were positive, affirmative statements by Holmes, unqualified by any claim that the shooting was an accident. Fourth, there was evidence that Holmes had a motive to kill Williams because Holmes knew Williams had money that day, and Holmes admitted intending to rob Williams and searching Williams' body for the money after he shot him. The evidence, particularly Holmes' own admissions, is legally sufficient to support a finding that he

either intentionally killed Williams by shooting him, or intended to cause Williams serious bodily injury and shot him, thereby causing his death.

Accordingly, based on the foregoing reasons, we overrule Holmes' legal sufficiency challenge on both bases, and affirm the trial court's judgment.

Phylis J. Speedlin, Justice

DO NOT PUBLISH