COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



RICHARD FLORES, §

§ No. 08-07-00330-CR

Appellant, §

§ Appeal from the

v. §

§ 210th District Court

THE STATE OF TEXAS, §

§ of El Paso County, Texas

Appellee. §

§ (TC#20050D02301)

§

**O P I N I O N**

This is an appeal from a jury conviction for the offense of murder. The jury assessed punishment at ninety-nine years' imprisonment, and a fine of $10,000. We affirm.

## I. SUMMARY OF THE EVIDENCE

Appellant was tried and convicted of murdering Maria Corral. Appellant met Mary Corral, as she was called, in 2002, and they became a couple. They had three young children at the time of her death. Their relationship was troubled, and she was living with her mother at the time of her murder. The deceased's mother testified that two weeks prior to Mary Corral's murder, Appellant had threatened to kill Mary if she left him. He had made other threats on other occasions. On the evening of April 28, 2005, Mary went to a dance club with her friend, Elizabeth Lara. At the same time, Appellant, known as "Playboy," and his friends Danny Rios, Angel De Leon, known as "Devil," Guillermo Palma, Appellant's cousin known as "Gordo," Monica Garcia, and Amanda

Molina, were celebrating Appellant's birthday at Appellant's mother's house. Appellant called Mary Corral a number of times that evening requesting that she come by. Her refusals caused Appellant to become increasingly upset, and he stated, "This stupid bitch is giving me attitude." Monica and Amanda left the party.

Appellant's mother, Emeteria Hinojos, stated that she was afraid of Appellant when he drank. On such occasions, she would sleep in her van at a neighbor's house. She stated that she went to work in the evening of April 28, 2005, and that Appellant was mad at her for refusing to allow him to have a party at the house. She returned from work at 11 p.m. to find the party in progress and Appellant became angry. She left her home to sleep in her van at a friend's house.

Mary Corral and her friend Elizabeth left the dance club, and Mary decided to drop by the party. Elizabeth dropped Mary off at the party at 12:30 a.m. on April 29, 2005. Appellant's mother returned home at 7 a.m. on April 29, 2005, and found her son, Gordo, and Devil asleep in the house. She left to have coffee with her sister, and when she returned, the three were gone. She became concerned when she found out that Appellant was not at school. Hinojos asked her niece, Claudia Gonzalez, to come to the house. Eventually the police were called.

Jimmy Young, a neighbor, testified that at about 10 a.m. on April 29, 2005, he saw a police officer arrive at Hinojos's house. He was asked to translate by Hinojos's niece, because the responding officer, Officer Charles J. Kovacs, did not speak Spanish. Young testified that Hinojos appeared scared. Officer Kovacs suggested that as her son was an adult, she could remove him from her home by getting his belongings and putting them outside. She took that advice, and she and her niece began collecting Appellant's possessions. During this process, they discovered Mary Corral's dead body, wrapped in a sheet and garbage bags, in Appellant's bedroom closet.

2

The crime scene investigators removed the garbage bags and the sheet from the body and discovered duct tape wrapped around the deceased's ankles and around her right arm. A garbage bag was found inside the outer wrapping of the body that contained a piece of duct tape with blood and hair on it, the deceased's purse, her shoes, a roll of duct tape, various personal effects, and a pruning saw. Fingerprints that were later matched to Appellant were found on that garbage bag and on the sticky side of the roll of duct tape.

Detective Arturo Ruiz testified that Appellant fled to Mexico after the killing. An indictment was returned in May of 2005 charging Appellant with murder. Around September 23, 2005, Appellant was arrested in Juarez, Mexico. He was extradited back to the United States on March 24, 2006. In the late evening of March 24, 2006, Appellant confessed to murdering Mary Corral by strangling her.

Appellant gave his confession to Detective Ruiz in Spanish. Appellant related that he had consumed large amounts of beer and drugs such as heroin and rohypnol on the night of his birthday party. His plan was for Gordo and Devil to hide in Appellant's bedroom closet and they were to scare the deceased by jumping out when she got to the bedroom. He then planned to tie her up and slap her around to cause her to fear a severe beating so that she would not "do stupid things" to him anymore. Appellant stated that Devil and Gordo jumped out of the closet and taped her legs, hands, mouth, nose, eyes, and face and that Devil stated that they had to kill her when Appellant inadvertently used Devil's name. Appellant agreed to kill Corral after Devil told him she had been unfaithful. Appellant hit Corral and bit her nose.

Appellant stated in his confession that Devil tried to suffocate Corral with a plastic bag. When that failed, Gordo brought Appellant an extension cord. Appellant threw the cord to Devil

3

because he was a minor. Devil was unable to strangle Corral with the cord. Appellant and Devil each pulled on one end of the cord until Corral died. Gordo attempted to dismember Corral's body. Appellant asked the detectives who were taking the confession how many years he would get for pulling the extension cord.

On March 14, 2007, the police obtained a letter that Appellant sent to Rafaela Guillen while he was in jail. It stated in pertinent part:

> I was doing a lot of roches, coke weed and let's not start on the alcohol or the beer.
>
> . . .
>
> We were crushing roches and sniffing them like it was coke, too. My homeys took off and Devil, Gordo and I stayed at the fucking house, then this bitch called and told me to change because I was thugged out.
>
> . . .
>
> I was just popping those shits like they were candies. So I was all Roched up and I finished a bottle of Oso Negro by myself because these fools were drinking Budweiser and shit. So this bitch called and told me she was outside and for me to go and get here [sic] so that she could show me to her friend. So I told these fools to hide inside the fucking closet and so they did because they were supposed to tie her up and scare the shit out of her. And they did all right.
>
> . . .
>
> [A]nd then we were walking to my room and I told these fools "Salgan." So they jumped out of the closet and this bitch was scared . . . .
>
> . . .
>
> They tied her up with the duct tape and I said, Devil, your chick–said–Devil, your chick say about this bitch. And he called me to the other side of the room and said, Hey–Hey, fool, you fucked up

4

'cause you said my name now we have to kill this bitch.

And I told him, Fuck you shit. So I got some dice and I said if I roll snake eyes we kill her. And so I rolled and "Boom" snake eyes. And we looked at each other like, What the fuck? So I said, No fool, kick back. Let me roll again but this time I have to roll a 7. And I rolled a fucking 7 landed. So I couldn't believe what was going on. I remember it was a 4 and 3.

So I opened a Budweiser can and I chugged it and I put my favorite song and I turned the radio up and I said, Go for it. So Devil went downstairs and he got a bag and put it on her face. . . . But she wasn't dying. So I told Devil, Move motherfucker and I pushed him away and Gordo sat–said, Try this.

So he tossed an extension cord and Devil put it around her neck and I pulled from one side and he pulled from the other and she stopped moving . . . .

[T]hey tried to cut her in pieces but couldn't. So we just put her in bags. And we put her inside my closet . . . .

## II. DISCUSSION

In Issue One, Appellant asserts that the court erred in admitting Appellant's confession because it was obtained in violation of Appellant's Sixth Amendment right to counsel. Specifically, Appellant contends that he was represented by counsel while he awaited extradition from Mexico to the United States and that the detectives who took Appellant's confession were prohibited from approaching Appellant without first obtaining permission from Flores's attorney.

There were two hearings on Appellant's motion to suppress the confession prior to trial. At the first hearing, Appellant asserted that his confession was involuntary because he had been suffering from fatigue when he confessed, his confession had been induced by a promise that he could speak to his mother, and that his extradition was improper due to the breach of representations made to the Mexican government. The concerns regarding legal representation centered on whether

5

Appellant had requested an attorney named John Needham. Detectives Chavarria and Ruiz testified at the suppression hearings that Appellant never asked for an attorney or told them he had an attorney. Appellant only stated at the end of the interview that Needham was a family member. Detective Chavarria testified that he administered the *Miranda* warnings to Appellant including his right to counsel. Appellant indicated he understood those rights and he agreed to waive them.

Appellant testified at the suppression hearing. He indicated that he was arrested in Juarez, Mexico and was taken to police headquarters. From there he was taken to Mexico City. After approximately six months, he was returned to the United States. Detective Arturo Ruiz of the El Paso Police Department testified that on March 24, 2006, he met Appellant at the airport in El Paso, and took custody of Appellant from the United States marshals who had accompanied him from Mexico City. He was taken to the police department, given the requisite warnings, and a confession was obtained.

Appellant testified that during his interrogation in El Paso, he told the detectives that he wanted to talk to John Needham or some other lawyer, but that the detectives proceeded with the interrogation.[1] The trial court denied Appellant's motion to suppress the confession.

At trial, Appellant objected to the admission of his statement. He argued, partly, that his waiver of counsel at the time he gave his confession was invalid because his Sixth Amendment rights had attached due to his representation during the extradition proceedings by a Mexican lawyer who had been appointed in Mexico to assist him in Mexico regarding the extradition proceedings. The State agreed that Flores had been represented in Mexico by counsel for the extradition proceedings. The record does not reveal the identity of this attorney, or any evidence that this

---

[1] Appellant has not raised the matter of John Needham's representation on appeal.

6

Mexican attorney was involved in representing Appellant on the murder charges in the United States. The court overruled Appellant's objection to the admission of the confession.

We review a trial court's ruling on a motion to suppress using the bifurcated standard articulated in *Guzman v. State*, 955 S.W.2d 85 (Tex. Crim. App. 1997). *See Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Krug v. State*, 86 S.W.3d 764, 765 (Tex. App.–El Paso 2002, pet. ref'd). We do not engage in our own factual review because at a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony. *See State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). We give almost total deference to the trial court's ruling on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); *Best v. State*, 118 S.W.3d 857, 861-62 (Tex. App.–Fort Worth 2003, no pet.). We review *de novo* a trial court's rulings on mixed questions of law and fact if they do not turn on the credibility and demeanor of witnesses. *Johnson*, 68 S.W.3d at 652-53. If the trial court's ruling on the admissibility of a custodial statement turns on an evaluation of credibility and demeanor, we are not at liberty to disturb any finding which is supported by the record. *See Dewberry v. State*, 4 S.W.3d 735, 747-48 (Tex. Crim. App. 1999). Ordinarily, we consider only the evidence adduced at the suppression hearing. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). But where, as here, the suppression issue has been consensually relitigated at trial, we review the entire record, to determine whether the confession was voluntary. *See id.*

**A. Sixth Amendment Right to Counsel**

The Sixth Amendment right to assistance of counsel does not attach prior to the initiation of

adversarial judicial proceedings, which may be initiated by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Montejo v. Louisiana*, --- U.S. ---, 129 S.Ct. 2079, 2085 (2009); *United States v. Gouveia*, 467 U.S. 180, 187-88, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984). Once the adversary judicial process has been initiated the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. *Green v. State*, 872 S.W.2d 717, 719 (Tex. Crim. App. 1994). Formerly, once an accused requested the assistance of counsel based on his Sixth Amendment right the police could not initiate any questioning or attempt to induce a waiver of his right to counsel for that police interrogation and any waiver obtained was invalid. *Michigan v. Jackson*, 475 U.S. 625, 635-636, 106 S.Ct. 1404, 1410-11, 89 L.Ed.2d 631 (1986). Specifically, *Jackson* held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Id.* at 636. This prophylactic protection of the Sixth Amendment is no longer available.

In *Montejo v. Louisiana*, --- U.S. ---, 129 S.Ct. 2079 (2009), the United States Supreme Court overruled the bright-line rule articulated in *Jackson*. In *Montejo,* counsel was appointed at a preliminary hearing. Apparently, Montejo stood mute at the hearing. He made no request or assertion of his Sixth Amendment right to counsel. However, the court did appoint counsel. The police, unaware that counsel had been appointed for Montejo, approached Montejo, who was in confinement, and requested that he accompany them to locate the murder weapon. The police read Montejo his *Miranda* rights, and he agreed to go with them. At that time, Montejo wrote an inculpatory letter of apology to the victim's widow. At trial Montejo argued that the letter should be suppressed because the police had initiated the interrogation after his right to counsel had

attached. The letter was admitted at trial, and Montejo was convicted. The Louisiana Supreme Court affirmed Montejo's conviction, rejecting his argument that under the *Jackson* rule the letter should have been suppressed. *Louisiana v. Montejo*, 974 So.2d 1238 (La. 2008). In *Montejo*, the United States Supreme Court rejected the *Jackson* Court's conclusion that a defendant's request for counsel at an arraignment should be treated as an invocation of the Sixth Amendment right to counsel at every subsequent critical stage in the prosecution despite doubt that defendant intended his request for counsel to encompass representation during any further questioning. The Court held that "it would be completely unjustified to presume that a defendant's consent to police-initiated interrogation was involuntary or coerced simply because [the defendant] had previously been appointed a lawyer." *Montejo*, --- U.S. at ---, 129 S.Ct. at 2088. The United States Supreme Court held that after the right to counsel has attached, "a defendant who does not want to speak to the police without counsel present need only say as much when he is first approached and given the *Miranda* warnings." At that point, not only must the immediate contact end, but "badgering" by later requests is prohibited. *Montejo*, --- U.S. at ---, 129 S.Ct. at 2090.

The Court conducted a balancing test and found that the marginal benefits of *Jackson* (viz., the number of confessions obtained coercively that are suppressed by its bright-line rule and would otherwise have been admitted) are dwarfed by its substantial costs (viz., hindering "society's compelling interest in finding, convicting, and punishing those who violate the law"). *Montejo*, --- U.S. at ---, 129 S.Ct. at 2089.

The Court reasoned that "[e]ven without *Jackson*, few badgering-induced waivers, if any, would be admitted at trial because the Court has taken substantial other, overlapping measures to exclude them." *Montejo,* ___U.S. at ___, 129 S.Ct. at 2081. First, under *Miranda*, any suspect

subject to custodial interrogation must be advised of his right to have a lawyer present. *Miranda v. Arizona,* 384 U.S. 436, 473-74, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). Then, under *Edwards*, once such a defendant has invoked his [*Miranda]* right, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). And under *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486 (1990), no subsequent interrogation may take place until counsel is present. *Id*. at 153, 111 S.Ct. at 491; *Montejo*, ___ U.S. at ___, 129 S.Ct. at 2081. "If that regime suffices to protect the integrity of 'a suspect's voluntary choice not to speak outside his lawyer's presence' before his arraignment, it is hard to see why it would not also suffice to protect that same choice after arraignment, when Sixth Amendment rights have attached." *Montejo*, ___ U.S. at ___, 129 S.Ct. at 2090. Quoting *Patterson v. Illinois,* 487 U.S. 285, 296, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), the Court stated, "an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Montejo,* ___U.S. at ___, 129 S.Ct. at 2085. Based on that analysis, the Court found *Jackson* to be simply superfluous. *Id*.

Therefore, a court can no longer presume that a waiver of a right to counsel executed after the right to counsel has attached is invalid. An accused must make a clear assertion of the right to counsel when officers initiate interrogation and in that case no interrogation should take place. A subsequent waiver would be invalid if it follows an unequivocal election of the right to counsel. *Montejo*, ___ U.S. at ___, 129 S.Ct. at 2091.

10

Here the Appellant argues that because he was given appointed counsel in Mexico to deal with the extradition proceedings, this automatically causes his waiver of the right to counsel, prior to police interrogation, to be invalid. In light of the United States Supreme Court's ruling in *Montejo*, we do not agree.

## B. Voluntariness of Sixth Amendment Waiver

In light of the change in the legal landscape brought about by the Court's ruling in *Montejo,* the Court remanded so that Montejo might be given an opportunity to argue that his letter of apology should have been suppressed under the *Edwards* rule. *Montejo*, ___U.S. at ___, 129 S.Ct. at 2081. "[U]nderstandably [Montejo] did not pursue an *Edwards* objection, because *Jackson* offered broader protections . . . ." *Id.* Further, the Court felt it was appropriate to remand in order to allow Montejo "to press any claim he might have that his Sixth Amendment waiver was not knowing and voluntary, e.g., his argument that the waiver was invalid because it was based on misrepresentations by police as to whether he had been appointed a lawyer . . . ." *Cf. Montejo*, ___ U.S. at ___, 129 S.Ct. at 2092.[2]

Accordingly, we review Appellant's claim with the *Edwards* rule in mind. The *Edwards* rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990). It does this by presuming his post-assertion statements to be involuntary, "even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991). This

---

[2] Part of the Court's rationale in remanding the case was due to the Court's reluctance to determine if the state procedural rules allowed the admission of some evidence concerning the police activity and was properly in the record. *Montejo*, --- U.S. at ---, 129 S.Ct. at 2092. We have no such difficulty with the record before us.

11

prophylactic rule thus "protect[s] a suspect's voluntary choice not to speak outside his lawyer's presence." *Montejo*, ___ U.S. at ___, 129 S.Ct. at 2085-86.

Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant so long as a relinquishment of this right is voluntary, knowing, and intelligent. *Id.* at 2085, *citing Patterson,* 487 U.S. 285, 292, n.4, 108 S.Ct. at 2389. "The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. " *Montejo*, ___ U.S. at ___, 129 S.Ct. at 2085, *citing Harvey,* 494 U.S. 344, 352-53.

Waiver is demonstrated regarding pretrial questioning if an accused decides voluntarily not to rely on his right to counsel and that decision is made under the understanding that he could remain silent and request a lawyer and that the State could use any statement he gave against him. *Arabzadegan v. State,* 240 S.W.3d 44, 48 (Tex. App.–Austin 2007, pet. ref'd).

Preliminarily, we note that Appellant does not challenge the validity of the waiver. Appellant's argument is wholly based on the existence of a Mexican attorney. The attorney is never identified nor is there indication in the evidence that the Mexican attorney had any connection with the murder charge. Furthermore, the Sixth Amendment right to counsel is offense specific. *Templer v. State*, 917 S.W.2d 133, 134 (Tex. App.–Fort Worth 1996, pet ref'd). There is no evidence that after Appellant received his *Miranda* warnings, he invoked his right to the Mexican counsel. Furthermore, there is no evidence in the record to indicate that the Appellant may have been coerced, badgered, or tricked into waiving his right to counsel. In light of the ruling in *Montejo*, we find that the court did not err in admitting the video-recorded statement.

## C. Harm Analysis

However, even if error did occur, we find the error, if any, to be harmless. In *Chapman v.*

12

*California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court set forth the test for determining whether a federal constitutional error is harmless. That test, the Court said, is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. at 828. Under *Chapman*, a federal constitutional error "did not contribute to the verdict obtained" if the verdict "would have been the same absent the error . . . ." *Neder v. United States*, 527 U.S. 1, 15-18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The *Chapman* test is codified in Texas Rule of Appellate Procedure 44.2(a), which provides that constitutional error requires reversal of the judgment "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a).

In an appellate assessment of the likelihood that, absent the trial court's error, the jury verdicts as to appellant's conviction and punishment would have been the same, we must consider the entire record. *Neder*, 527 U.S. at 15-16. Among the factors, as revealed by the record, that we must consider are: (1) the importance of the evidence to the State's case; (2) whether the evidence was cumulative of other evidence; (3) the presence or absence of other evidence corroborating or contradicting the excluded evidence on material points; and (4) the overall strength of the State's case. *Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006). We must also consider any other factor, as revealed by the record, that may shed light on the probable impact of the trial court's error on the minds of average jurors. *Id.*

Here, the record showed a pattern of abuse, threats and anger by the Appellant towards the deceased at the time of the killing. Appellant's fingerprints were found on the garbage bag that contained her body. Appellant fled. Further, he wrote a grisly letter from jail to a friend detailing

13

his involvement in the offense. While it is true that during jury argument the State asked the jury to observe Appellant's indifferent attitude during the videotaped confession, the State also argued that the evidence supported Appellant's guilt even without the tape. The State's case was strong, and there was no contradictory evidence whatsoever. The statements in the letter were fully corroborative and compelling. We find that the error, if any, did not contribute to his conviction or punishment, and any error was harmless. Accordingly, Issue One is overruled.

In Issue Two, Appellant contends that the court erred when it allowed Appellant's Spanish language videotaped confession to be admitted and presented to the jury without providing a contemporaneous translation of the confession as it was played for the jury. At trial, due to the fact that Appellant's videotaped confession was primarily in Spanish, the State prepared and presented into evidence a transcript of a sworn, Spanish-to-English translation of the videotaped statement to assist the jury. Araceli Guevara, the sworn interpreter, testified at trial about her qualifications. She was cross-examined regarding the accuracy of her work.

Appellant's counsel requested that the videotape be translated contemporaneously by a live interpreter with the showing of the video to the jury. Counsel stated that the non-Spanish speaking jurors would only be reading the translation as the tape was played. Therefore, they would be unable to correlate the English translation with Appellant's statements and the context in which they were made. The court responded that the translation and the videotape would be available to the jury during deliberations, and they could watch it and read the translation again if needed. The court denied Appellant's request.

At closing argument, the State pointed out that Appellant looked comfortable and laughed during some parts of the videotaped interview. The State asked the jury to observe Appellant's

demeanor while he described how he killed Mary Corral, in particular, his smile and lack of concern. The State directed the jury to specific times during the videotaped interview to observe Appellant as he described how Mary struggled–at 41:30 minutes, and how he pulled the extension cord around her neck and strangled her–at 43:30 minutes.

The trial judge has wide discretion in determining the adequacy of interpretive services. The question on appeal is not whether the "best" means of interpretive services were employed, but whether the services that were actually employed were constitutionally adequate such that the defendant could understand and participate in the proceedings. *Linton v. State,* 275 S.W.3d 493, 500 (Tex. Crim. App. 2009). The translation must be accurate or "true," but it need not be perfect. *Id.* at 501-02. An abuse of discretion standard is utilized by appellate courts to determine if the court erred. *See id.* at 502.

Appellant cites *Leal v. State,* 782 S.W.2d 844 (Tex. Crim. App. 1989) in support of his contention that a contemporaneous translation was required. We do not agree that it stands for that proposition. In *Leal,* the Court of Criminal Appeals determined that the admission of a recorded conversation in a foreign language is analogous to testimony by a non-English speaker and the safeguards of article 38.30 of the Code of Criminal Procedure apply.[3] *See id.* at 849. The court determined that because an interpreter must be sworn to translate the recorded conversation, the trial court in that case erred in admitting the tape recording into evidence with an unsworn translation.

---

[3] Article 38.30 of the Texas Code of Criminal Procedure provides that in a criminal proceeding, when "it is determined that a person charged or a witness does not understand and speak the English language, an interpreter must be sworn to interpret for the person charged or the witness." TEX. CODE CRIM. PROC. ANN. art. 38.30 (Vernon Supp. 2009). When a trial judge is aware that the defendant has a problem understanding the English language, the judge has an independent duty to implement this right in the absence of a knowing and voluntary waiver by the defendant. *Garcia v. State*, 149 S.W.3d 135, 145 (Tex. Crim. App. 2004).

15

*Id.* at 849-50. In *Leal* there was no testimony as to who actually translated the conversation. No one was positively identified as the translator in court and no one was sworn in by the trial court as an interpreter. *Id*. at 847. Whoever the interpreter was, was not called to the stand so the accuracy of their work could be subject to cross-examination. *Id*. at 849.

The Appellant does not challenge the quality or accuracy of the translation. Rather his complaint is that the non-Spanish speaking jurors would only be reading the translation and would be unable to correlate the translation with the spoken statements and the context in which they were made. As the court noted, the jury would have the translation and videotape available to view during deliberations if necessary. Playing the video of the Appellant's statement enabled the jury to assess the Appellant's non-verbal behavior which was particularly important in evaluating the testimony. However, we note that playing the audio in Spanish for the jury was unnecessary.

The interpreter's rendition of the Appellant's statement created the only permanent record of what was said. It is as if the non-English language was never spoken before the jury and the interpreter stands in place of the witness. There is in fact no requirement or means available at trial to preserve the original foreign language spoken in court. It is the translation presented by the interpreter that creates the record and that ultimately serves as the basis for any potential appeal.[4] In this case all the jurors should have been focused on the written translation and not on the Spanish audio. We find that the written translation satisfied the requirements of Article 38.30, Texas Code of Criminal Procedure. The interpreter was positively identified, qualified, officially sworn and subject to cross-examination.

---

[4] Roseann Duenas Gonzalez, Victoria F. Vasquez & Holly Mikkelson, Fundamentals of Court Interpretation, Theory, Policy and Practice 485 (1991).

16

We find that the translation provided was adequate. The court did not err in failing to provide a contemporaneous translation.

However, even if error did occur, we find the error, if any, to be harmless. We use the standards regarding a harm analysis enunciated in the prior discussion. In the present case, as stated, there was overwhelming evidence of Appellant's guilt. Appellant states that harm occurred in that both the State and the defense focused on Appellant's actions during certain parts of the video, and non-Spanish speaking jurors would have no way of knowing if the party's arguments were correct or not; thereby potentially causing other jurors to be consulted. However, we find nothing in the record before us that indicates that in fact occurred. We further note that there is nothing in the Appellant's statement that would qualify as lighthearted or humorous. We find that no harm occurred. Issue Two is overruled.

In Issue Three, Appellant argues that the court erred by admitting a letter written by appellant without proper authentication. Detective Ruiz stated that he intercepted a letter from Appellant's jail mail, and he made a copy of the letter. He later retrieved the letter from Rafaela Guillen after the letter was delivered to her. Guillen stated that she had known Appellant since they were both five years old, but she was not familiar with his handwriting. The letter was signed "Richard Flores" and contained the nickname "Playboy" which was Appellant's nickname. Guillen testified before the jury that the envelope in which the letter had been sent was addressed to her at her previous address and contained Appellant's name, his jail identification number, 9282439, and the return address of 12501 Montana, El Paso, Texas. She testified that she had previously received five or six letters from Appellant and she had not been receiving letters from anyone else at jail. Appellant objected to the admission of the letter on grounds that, among other things, the letter had not been

17

properly authenticated. The court admitted the letter into evidence.

An appellate court may not disturb a trial court's evidentiary ruling absent an abuse of discretion. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). As long as the trial court's ruling is within the zone of reasonable disagreement and is correct under any theory of law applicable to the case, it must be upheld. *Id.*, *citing Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims. TEX. R. EVID. 901(a). Evidence may be authenticated by the testimony of a witness with knowledge that a matter is what its proponent claims it to be, nonexpert opinion as to the genuineness of handwriting based upon familiarity not acquired for the purposes of the litigation, or other distinctive characteristics. TEX. R. EVID. 901(b)(1), (2), (4).

Under the circumstance in this case, we find that the letter was adequately authenticated. *See Reyes v. State,* No. 14-96-01189-CR, 1998 WL 733681, at *2 (Tex. App.–Houston [14th Dist.] Oct. 22, 1998, pet. ref'd) (not designated for publication) (the return address on the envelopes identifying the accused as the sender and listing his jail-identification number, and the address for the Harris County Jail as the sender's address, indicated that the accused sent the letters from his cell at the Harris County Jail). The letter was signed "Richard Flores" and contained his nickname, "Playboy." Furthermore, the letter indicated that Appellant had sent Guillen letters and photos, facts known to both Appellant and Guillen. The letter contained details of the murder which would be known to the murderer. Detective Ruiz identified the letter as being the same letter he intercepted and copied from the Appellant's jail mail and later retrieved from Guillen. He had personal knowledge and

18

testified that it was the same letter. We find the letter was properly authenticated.

Even assuming that the court erred, we find that no harm occurred. An appellate court will not reverse a ruling based on non-constitutional error that does not affect "substantial rights." *See Neal v. State,* 256 S.W.3d 264, 284-85 (Tex. Crim.App. 2008), *citing* TEX. R. APP. P. 44.2(b). The reviewing court examines the record as a whole, and if the court determines that any error had slight effect or no effect on the jury, then the reviewing court should not overturn the trial court's ruling. *See id.* at 285. The presence of overwhelming evidence of guilt plays a determinative role in this analysis. *See id.*

Appellant states that the letter presents a darker picture than was depicted in the video confession. However, the letter comports with the confession except for the statement about rolling the dice to determine Corral's fate. We find that other evidence in the case provides support for the depiction of overwhelmingly gruesome, depraved act. As such, no harm occurred. Issue Three is overruled.

In Issue Four, Appellant contends that the court erred when it admitted four autopsy photos which showed the deceased's body in a gruesome manner. Appellant complains of two views of Corral's neck with the skin peeled off. Two other photos showed Corral's eyes with a medical instrument holding each eye open.

We review a trial court's admission of photographs into evidence under an abuse of discretion standard. *Penry v. State*, 903 S.W.2d 715, 751 (Tex. Crim. App.), *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995). A photograph is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401; *Penry*, 903

S.W.2d at 751. The identity of the victim and the manner and means of death are facts that are of consequence to the determination of an action. *Penry*, 903 S.W.2d at 751.

The photographs in question were relevant to show the cause of death. Photographs showing mutilation by the medical examiner may be admissible when the photographs show bruising or other damage that is attributable to an accused's actions but is not visible externally. *Ripkowski v. State,* 61 S.W.3d 378, 392-93 (Tex. Crim. App. 2001), *cert. denied,* 539 U.S. 916, 123 S.Ct. 2274, 156 L.Ed.2d 133 (2003). The medical examiner testified that all four pictures were helpful and necessary in demonstrating that strangulation was the cause death. Two of the pictures demonstrated hemorrhaging around the iris that was consistent with hemorrhaging that occurs during strangulation. The other two pictures showed the hemorrhaging caused by compressing the deceased's neck which assisted in explaining her injury and the cause of death. While Appellant asserts that the photographs were not relevant because the cause of death was not contested, such evidence is admissible even if it merely corroborates other evidence. *See Cohn v. State*, 849 S.W.2d 817, 820-21 (Tex. Crim. App. 1993). We find that the photographs were relevant.

Evidence may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See Salazar v. State,* 38 S.W.3d 141, 151 (Tex. Crim. App. 2001), *cert. denied,* 534 U.S. 855, 122 S.Ct. 127, 151 L.Ed.2d 82 (2001). TEX. R. EVID. 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. When the accused objects that photographic evidence is more prejudicial than probative, the trial court must conduct a balancing test under Texas Rule of Evidence 403. *Jones v. State*, 982 S.W.2d 386, 394 (Tex. Crim. App. 1998), *cert. denied*, 528 U.S. 985, 120 S.Ct. 444, 145 L.Ed.2d 362 (1999). Under Rule 403, the trial court determines whether the probative

value of the evidence is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403; *Reese v. State,* 33 S.W.3d 238, 240 (Tex. Crim. App. 2000). Evidence is unfairly prejudicial when it has "an undue tendency to suggest that a decision be made on an improper basis." *Reese*, 33 S.W.3d at 240, *citing Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op. on reh'g). When conducting a Rule 403 balancing test, the trial court should analyze: (1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational way; (3) the time the proponent will need to develop the evidence; and (4) the proponent's need for the evidence, i.e., whether other evidence is available and whether the fact of consequence is related to a disputed issue. *Montgomery*, 810 S.W.2d at 389-90. When analyzing photographic evidence, the trial court should also consider the number and the size of the photographs, whether they are in color or black and white, the detail shown in the photographs, whether the photographs are gruesome, whether the body is naked or clothed, and whether the body has been altered since the crime in some way that might enhance the gruesomeness of the photographs to the accused's detriment. *Reese*, 33 S.W.3d at 241.

Even if the photographs are gruesome, that fact alone does not render them more prejudicial than probative. *See Shavers v. State*, 881 S.W.2d 67, 77 (Tex. App.–Dallas 1994, no pet.). Here, the photographs were relevant to show the cause of death as ligature strangulation. As stated, the closeup photographs of the eyes showed a type of hemorrhaging around the iris that was consistent with the type of hemorrhaging that occurs during strangulation. Holding the eyes open enabled the jury to see the full extent of the hemorrhaging. *See Hayes v. State,* 85 S.W.3d 809, 816 (Tex. Crim. App. 2002) (if the victim's skin on her face had not been pulled back, the jury would not have been able to see the full extent of one of her fatal injuries). The photographs depicting the inside of the

21

deceased's neck depicted the internal injuries that were not visible externally and were relevant to show the nature of the injuries.

In this instance, there was no great time expended in presenting the evidence and the evidence was relevant to show the cause of death. While gruesome, the evidence was pertinent in demonstrating the cause of death from strangulation. We find that the court did not err in admitting the photographic evidence.

Even if error occurred, such error constitutes non-constitutional error; thus, we must disregard it unless it affected Appellant's "substantial rights." TEX. R. APP. P. 44.2(b); *Potter v. State*, 74 S.W.3d 105, 113-14 (Tex. App.–Waco 2002, no pet.). An error affects a substantial right "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Thus, we affirm a criminal conviction despite non-constitutional error if, after examining the record as a whole, we are left with the fair assurance that the error did not influence the jury, or influenced the jury only slightly. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). *See also O'Neal v. McAninch*, 513 U.S. 432, 438, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (error must be treated as harmful if "grave doubt" exists as to whether it had a "substantial and injurious effect or influence" upon the jury). We analyze the whole record to determine if the trial court's error had no or only a slight effect on the jury's decision; thus, we may consider the trial court's instructions to the jury and the parties' closing arguments. *Schutz v. State*, 63 S.W.3d 442, 444-45 (Tex. Crim. App. 2001). We consider all the evidence, the nature of the evidence supporting the sentence, and the character of the error and its relationship to other evidence to determine if the error substantially affected appellant's rights. *See Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).

22

Here, there was overwhelming evidence of guilt. *See Neal,* 256 S.W.3d at 285 (even if the trial court erred in admitting evidence, such error was harmless in light of the overwhelming guilt shown by other evidence). And while Appellant maintains that the State argued that the photographs showed "how Mary ended up," this statement was not in reference to the autopsy photographs. Accordingly, the State did not emphasize the autopsy pictures. Further, a conviction should not be reversed merely because and for the sole reason that the jury was exposed to numerous gruesome photographs. *See Drew v. State,* 76 S.W.3d 436, 453 (Tex. App.–Houston [14th Dist.] 2002, pet. ref'd). Accordingly we find no harm and Issue Four is overruled.

## III. CONCLUSION

We affirm the judgment of the trial court.


GUADALUPE RIVERA, Justice

October 28, 2009

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)
(Publish)

23