COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
|---|---|---|
| BRYAN EARL TILFORD, | | No. 08-09-00154-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 41st District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 20060D00718) |
| | § | |

**O P I N I O N**

Bryan Earl Tilford appeals his conviction of capital murder. A jury found Appellant guilty and his punishment was automatically set at life imprisonment because the State had given notice it would not seek the death penalty. *See* TEX.PENAL CODE ANN. § 12.31(a)(2)(West Supp. 2010). For the reasons that follow, we affirm.

**FACTUAL SUMMARY**

On May 26, 1989, the nude body of Rosalina Reyes was found in an elevator at the Brookhollow Apartments. She had been stabbed in the torso and vagina and had been strangled with a ligature. Appellant lived in the same building where Reyes' body was found. The El Paso Police Department was unsuccessful in solving the murder but they received new evidence in 1994 when a private investigator forwarded a copy of a letter allegedly written by Reyes' killer. The author identified himself as Keith Larone Jones and the "Pheonix" [sic]. In early March of 1995, Detective Joe Zimmerly traveled to Fort Leavenworth[1] and interviewed Appellant after providing him with his

---

[1] Appellant was in Fort Leavenworth serving a nine year sentence for stabbing a woman.

*Miranda* warnings. Appellant denied committing the murder. When Zimmerly told Appellant that he believed Appellant was the author of the "Pheonix" letters, Appellant became extremely upset and terminated the interview. EPPD submitted the "Pheonix" letters to the FBI's Behavioral Analysis Unit for handwriting analysis along with twenty-three known examples of Appellant's handwriting. With its highest degree of probability, the BAU concluded after an intensive analysis that Appellant was the author of the two "Pheonix" letters.[2] On December 4, 2005, Judge Gonzalo Garcia signed a warrant for Appellant's arrest. Detectives David Samaniego and Gonzalo Chavarria of the El Paso Police Department flew to Kentucky and arrested Appellant. After being advised of his *Miranda* rights, Appellant gave the detectives a written statement in Kentucky. In that statement, Appellant denied killing Reyes and said someone had sent him the "Pheonix" letters while he was imprisoned at Fort Leavenworth. Upon his return to El Paso on December 15, 2005, Appellant made a videotaped statement after being *Mirandized*. Appellant continued to deny any involvement in the murder but he told the police that his girlfriend, Kandis Shirley, had killed the victim by stabbing her with a knife and choking her with the cord from her U.S. Army "hoodie."

A grand jury returned a capital murder indictment against Appellant, alleging that he intentionally and knowingly caused Reyes' death by strangling her neck with a ligature while in the course of committing aggravated sexual assault or by stabbing Reyes with a knife while in the course of committing aggravated sexual assault. A jury found Appellant guilty of capital murder and the trial court automatically assessed his punishment at life imprisonment because the State had given notice it would not seek the death penalty.

## SUFFICIENCY OF THE EVIDENCE

---

[2] The evidence regarding the extraneous offense, "the Pheonix" letters, and the FBI handwriting analysis was not admitted in evidence during Appellant's trial.

Appellant has raised seven issues including a challenge to the sufficiency of the evidence to prove he committed the offense. We will address the issues out of order and consider the legal sufficiency issue first.

*Standard of Review*

In his sixth and seven issues, Appellant challenges the legal and factual sufficiency of the evidence to prove he committed the offense. After Appellant filed his brief, the Court of Criminal Appeals determined that the *Jackson v. Virginia*[3] standard is the only standard a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex.Crim.App. 2010). Accordingly, we will review the evidence under the *Jackson v. Virginia* standard.

When assessing the sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. at 318-19; *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex.Crim.App. 2009); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). We give deference to "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 318-19; *Klein v. State*, 273 S.W.3d 297, 302 (Tex.Crim.App. 2008). We consider all of the admitted evidence, whether it was admissible or inadmissible. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007); *Wilson v. State*, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999). When the record supports conflicting inferences, we presume that the fact

---

[3] *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

finder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Clayton*, 235 S.W.3d at 778. Similarly, as fact finder, the jury is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App. 1991). The same standard of review applies to cases involving direct or circumstantial evidence. *Powell v. State*, 194 S.W.3d 503, 506 (Tex.Crim.App. 2006).

## The Identity Element

Although Appellant states in his brief that he is challenging all of the elements of capital murder, his argument is directed exclusively at the evidence establishing his identity as the perpetrator of the offense. The State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex.Crim.App. 2009), *cert. denied*, --- U.S. ---, 131 S.Ct. 103, 178 L.Ed.2d 64 (2010). The State concedes that its case against Appellant was entirely circumstantial.

## The Evidence

In May 1989, Rosalina Reyes lived with her sister, Lydia Rodriguez, in an apartment on Timberwolf near Magruder Street. On the evening of May 25, the two women walked to a nightclub where they drank beer and danced. They began walking home at approximately midnight but accepted a ride from a man who had been at the nightclub. Rodriguez had him drop them off before they actually reached the apartment complex so he would not know where they lived. The women continued walking home but Reyes began lagging behind since she was not used to wearing heels and had to remove the boots she was wearing. Rodriguez continued walking ahead while calling back to Reyes and telling her to hurry up. Rodriguez cut through the Brookhollow Apartments

because they were well lit but she became lost and had a difficult time navigating through the complex. During this time, she lost sight of Reyes. Rodriguez eventually arrived at their apartment at around 1:30 a.m. where she waited for Reyes for about forty-five minutes before going to bed. At 5 a.m., a man who lived in the Brookhollow Apartments found Reyes' nude body in an elevator on the third floor of the apartments. The medical examiner determined that Reyes had been stabbed multiple times in the torso and vagina while alive but her death was caused by ligature strangulation. The knife wound to the left upper chest penetrated the left lung and the wound in her left flank lacerated the kidney and renal artery. The assailant had also stabbed Reyes in the vagina six times. The deputy medical examiner who performed the autopsy concluded that the murder included an element of sadistic torture due to the mutilation of Reyes' genitalia while she was alive. Dr. Juan Contin, who was the Chief Medical Examiner for El Paso County in 1989, reviewed the autopsy report and photographs and testified that the ligature wound on Reyes' neck was consistent with the cord from a sweatshirt/hoodie. He also estimated that the knife which caused the stab wounds was three to four inches in length. Reyes had a blood alcohol level of .223 at the time of her death.

At the time of the murder, Appellant was in the Army and stationed at Ft. Bliss. He lived on the second floor of the building where Reyes' body was found. The police found a blood smear on the threshold of the elevator floor. They also found two blood smears on the second floor of the same building. One of these smears was found on the concrete floor between the elevator landing and the second-floor hallway to the residents' apartments. The other blood smear was on the wall outside of the elevator door on the second floor. Samples from all three blood smears were collected and submitted to the FBI lab for forensic testing. Tamyra Moretti, an FBI DNA expert, testified that the blood from the elevator threshold and from the concrete flooring of the second floor matched the victim's DNA. The third blood smear found on the wall outside of the elevator on the second floor

did not match the victim or Appellant. The police did not collect any blood from Appellant's apartment. Appellant's DNA was not found on the victim or at the scene.

Following Appellant's 2005 arrest in Kentucky, the police interviewed him. When Appellant indicated he believed the police no longer suspected him in the 1989 murder, Detective Gonzalo Chavarria decided to "bluff" Appellant by telling him they had found his DNA at the crime scene and asking him why his DNA would be at the crime scene. They did not, however, provide Appellant with any details of the offense nor did they specify whether the source of the DNA was blood, hair, saliva, or semen. In his written statement, Appellant explained that his girlfriend Kandis had a habit of pulling his body hair and throwing it everywhere around the apartment building, including the elevator. He claimed that Kandis sexually abused him. He also said that he chewed tobacco and regularly spit everywhere, including the apartment elevator. Appellant wrote on the back of his typewritten statement that his hair brush and "spit bottle" were missing from his truck on the day of the murder in El Paso and Kandis had used the truck.

After returning to El Paso ten days later, the detectives spoke with Appellant again and he gave a lengthy video-recorded statement. For the first time, Appellant admitted knowledge of the murder but he accused Kandis of killing Reyes. Appellant explained that he and Kandis had been living at Brookhollow Apartments for about a week before the murder. Consistent with his written statement, Appellant related that Kandis had pulled out head, arm, chest, moustache, and pubic hairs from his body and thrown them on the floor of the elevator. Kandis told him that if anything ever happened, he would get in trouble. On their first day at the apartment, Kandis told Appellant that "some bitch" had made her angry and that he did not need to worry about it because she would take care of it.

The night before the murder, one of Appellant's army buddies, Harry Short, came over to the

apartment for a visit. They drank beer, whiskey, and tequila. At around midnight, Kandis and Appellant drove Short back to the barracks. Appellant could not drive because he was drunk, so Kandis drove. When they returned to the apartments, Kandis saw the same woman who had made her angry and Kandis threatened to run over her. She told Appellant he would be blamed for it because it was his truck. Kandis and Appellant returned to their apartment before 2 a.m. and Kandis helped him undress. Kandis left while Appellant continued to drink because her comments upset him. Appellant did not know where she had gone but he believed she had driven home in his truck. At some point, Appellant hit his head and fell to the floor. When Appellant heard "hooping and hollering" and car horns outside, he got up to check on it because he realized that he had not heard his truck leave the parking lot. He put on a white striped shirt, jeans, and tennis shoes and staggered down the stairs. Appellant saw that the driver-side door of his truck was open. He heard a noise at the elevator and heard Kandis angrily call someone a bitch from inside of the elevator. The elevator door opened and Kandis exited and ran toward his truck. She was carrying his Uncle Henry knife that he kept in his truck. The knife had a four-inch blade. He recalled that Kandis was wearing a U.S. Army sweatshirt that evening. He did not recall whether Kandis was carrying any items of clothing when she exited the elevator.

Appellant then saw a naked, or partially naked, woman lying on her back on the elevator floor.[4] He described her as Hispanic, approximately 5' 5" tall with dark hair that was wavy or curly. He did not notice any injuries on the body and he did not see any blood. As he looked at the body, Kandis hit him on the head and he fell on top of the woman. He rolled off of her, and determined that the woman was not responsive and did not have a pulse. Panicked, he ran up the stairs toward

---

[4] Appellant initially described the victim as naked but he later said he only noticed that the victim's torso was not clothed.

the apartment. Kandis followed him with the knife still in her hand and told him to keep his mouth shut or she would harm their unborn child. The following day, Kandis came to the apartment and asked if he remembered what had happened the night before. When he indicated that he did, she repeated her threat. Appellant did not tell the police Kandis had committed the murder because he wanted to protect his children.[5] Appellant denied helping Kandis commit the offense or dispose of the clothing and knife.

Some time later when they were in Germany, Kandis told Appellant details about the murder. She told Appellant that she saw the woman outside of the apartment complex and yelled at her. Kandis led her into the elevator and attacked the victim from behind. Kandis stabbed her in the side while holding one hand over the victim's mouth. She knew that stabbing a person in the kidney was one way to kill a person. Kandis then stabbed the victim once in the chest with the intention of hitting the heart. The stab wound to the chest was horizontal between the ribs and Kandis moved the knife back and forth in an effort to cut the heart. Kandis also claimed to have stabbed the victim in the eyes. Kandis next removed the cord from her U.S. Army sweatshirt/hoodie and wrapped it around the woman's neck. Kandis even stomped on the woman's neck to make sure she was not breathing. Kandis did not put a knife in the victim's vagina but instead put her hand inside of the victim and "ripped" the vagina to make it look like she had been raped. Kandis was wearing rubber gloves when she did this. Kandis told Appellant that she attacked the woman because she refused to join her and Appellant in a sexual threesome. Kandis also noted that the victim had been barefoot, spoke English, and appeared intoxicated. Appellant told the police that the woman he saw in the elevator was the same woman Kandis wanted to run over with the truck. Finally, Kandis told him that she put the woman's clothes in a paper bag from Appellant's truck and put them in a trash can

---

[5] Appellant married Kandis and they had three children.

at the apartment complex. The interview concluded.

Later that same morning, Appellant asked to speak to Detective Samaniego again. He continued to state that he did not kill the victim, but he admitted for the first time that when he had heard all of the noise downstairs and went outside of his apartment, he saw the victim on the second floor of the apartment building . He asked whether she was okay but she did not answer. Appellant later became concerned about the woman and he went to check on her. That is when he found her dead in the elevator. He checked for a pulse and re-positioned her body so she would be more comfortable.

The State presented evidence to refute Appellant's statements. Harold Shirley, testified that his daughter, Kandis lived with him in May 1989. She had been engaged to Appellant for about four months. Shirley routinely required Kandis to wake him when she arrived home after being out in the evening to let him know she had returned and was safe. He recalled that Kandis did not stay out after midnight during that time period.

Kandis testified that even though she was pregnant and engaged to Appellant, she lived with her father in May 1989. After discovering she was pregnant in April, Kandis and Appellant began looking at apartments. After renting an apartment at Brookhollow, she began setting up the apartment and moving things into it, but she did not spend the night at the apartment until after they were married on June 2, 1989. She recalled seeing Appellant at the apartment on May 25, 1989, but she left in Appellant's truck at around 6 p.m. after they had an argument and she returned to her father's house where she was living. She returned to the apartment complex the following morning because they had errands to run. She noticed yellow police tape around the building and saw police cars and emergency vehicles. She parked the truck and took the stairs to the apartment. Kandis could not open the door with her key because Appellant had engaged the chain lock from the inside.

Appellant opened the door and Kandis noticed that it was extremely dark in the apartment because the curtains were drawn and all of the lights were turned off. Appellant was wearing only his military shorts. Kandis asked Appellant what was going on outside but he said he did not know what she was talking about. She noticed that he was jittery and not acting normal. Kandis denied ever sexually abusing Appellant.

Appellant's friend, Harry Short, testified that he met Appellant when they both lived in the barracks. Appellant moved out of the barracks at some point and into an apartment. The first time Short ever went to Appellant's apartment was after the murder. Short recalled that there was police tape across the elevator and he asked what happened.

The State also introduced a letter written by Appellant to Kandis in February 1991 when she was pregnant with their second child. Expressing anger because of the pregnancy, Appellant told her that this would be the last child they would have. After the child was born, he expected her to have her "tubes cut, tied and burned." Kandis and Appellant divorced in 1995 and neither she nor the children have had any further contact with him.

*Circumstances Establishing Appellant's Guilt*

A number of circumstances link Appellant to the murder and support the jury's finding of guilt. First, Appellant had the opportunity to commit the crime. He lived on the second floor of the apartment building where Reyes' body was found and her blood was found on the second floor near the elevator. Appellant was present at the apartment when Kandis left with his truck at around 6:30 that evening. Appellant said he saw the victim alive on the second floor of the apartment building sometime after midnight. *See Torres v. State*, 141 S.W.3d 645, 660-62 (Tex.App.--El Paso 2004, pet. ref'd)(in addressing legal sufficiency challenge in murder case, court considered evidence that defendant was last to see victim alive and was last seen with victim); *Reeves v. State*, 969 S.W.2d

471, 477-80 (Tex.App.--Waco 1998, pet. ref'd)(in addressing legal sufficiency challenge in murder case, court considered evidence that the defendant was the last one to see the victim alive and he had the best opportunity and motive for killing her).

Second, Appellant had ready access to and knowledge of the type of weapon used to stab Reyes and the weapon used to strangle her. *See Huffman v. State*, 775 S.W.2d 653, 661 (Tex.App.-- El Paso 1989, pet. ref'd)(in a murder case based on circumstantial evidence and involving ligature strangulation, court considered evidence that belt was found near the victim's bed, and concluded that it even though it was not conclusively shown to be murder weapon, defendant had access to a belt which gave him the capacity to inflict the fatal injuries). Appellant admitted to the police that he had collected knives since he was a child and at the time of the murder, he carried a knife in his truck for protection. Further, Appellant had two knives on his person and two additional knives in his truck at the time of his arrest. He also told the police that Kandis retrieved his Uncle Henry knife from his truck and stabbed the victim with it. That knife has a four-inch blade and is consistent with the medical examiner's testimony that the stab wounds were inflicted with a knife having a blade length of three-to-four-inches. Similarly, Appellant had ready access to and knowledge of the ligature used to strangle the victim. The medical examiner described the ligature wound as narrow and testified that it was consistent with the cord from a sweatshirt/hoodie. Appellant told the police that Kandis strangled the victim with the cord from her U.S. Army sweatshirt/hoodie. The jury could have disbelieved Appellant's claim that it was Kandis who killed the victim and instead believed that Appellant strangled the victim with the cord from his own U.S. Army sweatshirt/hoodie.

Third, Appellant's nervous demeanor and suspicious behavior the morning after the murder could have been construed by the jury as a consciousness of guilt. Excessive nervousness and an unsettled demeanor may be inferred by a jury as consciousness of guilt. *See Lassaint v. State*, 79

S.W.3d 736, 744 (Tex.App.--Corpus Christi 2002, no pet.)(acknowledging that a defendant's nervous behavior could show a consciousness of guilt). When Kandis arrived at the apartment the morning after the murder, she noticed a considerable commotion with the police and emergency vehicles present outside of the apartment. When she got up to the apartment, she found that it was quite dark because all of the curtains were drawn and the lights were off. Appellant claimed to not have any awareness of the "commotion" downstairs. She also noted that Appellant was jittery and did not seem normal.

Fourth, Appellant's story changed over time and was refuted or contradicted by other evidence. *See Ledesma v. State*, No. 08-04-00043-CR, 2005 WL 3254499, at \*7-8 (Tex.App.--El Paso Dec. 1, 2005, pet. ref'd)(not designated for publication)(defendant's varying and inconsistent explanations for the victim's disappearance supported jury's finding of guilt); *Huffman*, 775 S.W.2d at 660-61 (defendant's explanation of time when victim left, which was shown to be false, supported jury's finding of guilt). For years, Appellant denied any knowledge of the murder or the victim, but when the police told him in 2005 that his DNA had been found at the scene, Appellant began changing his story. Following his 2005 arrest, the police told Appellant that his DNA had been found at the scene but they did not specify the source of the DNA. Although Appellant had denied any involvement in the murder for years, Appellant presented implausible explanations as to how his hair or saliva might have gotten on the victim. Upon returning to El Paso in police custody, Appellant gave a video-recorded statement in which he admitted knowledge of the murder. Appellant accused Kandis and said he had come into contact with the body when Kandis hit him in the head and he fell onto the body in the elevator. Photographs show a considerable amount of blood on the victim's body and the floor of the elevator but Appellant denied getting any blood on his clothes. He claimed that he never revealed Kandis' crime because she had sexually abused him and

threatened to harm their children. After providing this version of events to the police, Appellant changed his story again. He said that he had seen the victim alive on the second floor of the apartment building and he even attempted to speak with her but she did not answer him. Concerned about the woman, Appellant later went looking for her and found her dead in the elevator. The jury was free to reject Appellant's varying versions of events and his accusations against Kandis. *See Cacy v. State*, 901 S.W.2d 691, 702 (Tex.App.--Amarillo 1995, pet. ref'd). This is especially true given that Appellant's stories about the night of the murder are refuted by Harry Short and Kandis. While Appellant claimed that he was with Short and Kandis until midnight on the night of the murder, and he and Kandis drove Short back to the barracks, Short testified he had never been to the apartment until after the murder. The wedding took place approximately one week after the murder. Kandis testified she had gone home around 6:30 or 7 that evening after an argument with Appellant and she did not return until the following morning. This refutes Appellant's assertion that he and Kandis saw the victim near the apartment that evening and Kandis threatened to run over her. It also contradicts Appellant's claim that it was Kandis who killed Reyes. Appellant's assertion that he fell onto the body but did not get any blood on him is not only inconsistent with the evidence, it is implausible given the amount of blood on the body and in the elevator. The jury could have inferred that Appellant had a consciousness of guilt given his creation of these stories, parts of which are implausible or inconsistent with the physical evidence and other testimony. *See Huffman*, 775 S.W.2d at 660. The jury could have viewed the same evidence as affirmative evidence of culpability. *Id.*

Fifth, Appellant had knowledge of details of the crime and crime scene only the assailant would know. *See Dossett v. State*, 216 S.W.3d 7, 13-15, 31 (Tex.App.--San Antonio 2006, pet. ref'd)(defendant's knowledge of the crime scene, which he said was revealed to him in a dream, was

a circumstance supporting his guilt). Appellant knew that the victim had been stabbed in the chest and kidney before being strangled. The order in which the injuries were inflicted would not have been apparent to an onlooker. While the stab wound to the chest was visible, the stab wound in the left flank was not visible and an onlooker certainly could not know that the knife lacerated the kidney. Appellant also knew that the assailant had inflicted stab wounds to the victim's vagina. Although there is blood on the victim's thighs, someone just looking at the body would not know that vaginal stab wounds were the source of the blood. Appellant's statement that the victim had been stabbed with a knife which had a four-inch blade is consistent with the medical examiner's findings. Likewise, Appellant's assertion that the victim had been strangled with the cord from a sweatshirt/hoodie was consistent with the medical examiner's findings. Finally, Appellant knew that the victim was intoxicated, spoke English, and was barefoot. There is no evidence any of the police officers ever revealed any of these details to Appellant during their interviews. It was the jury's task to evaluate all of the evidence and it could reject Appellant's claim that he received knowledge of these facts from another source. *See Cacy*, 901 S.W.2d at 702.

We conclude that the combined force of all of the incriminating circumstances was sufficient to allow a jury to conclude beyond a reasonable doubt that Appellant committed capital murder as alleged in the indictment. Issues Six and Seven are overruled.

## VALIDITY OF THE SEARCH WARRANT

In Issue One, Appellant contends that the affidavit supporting the arrest warrant is insufficient to establish probable cause he murdered Reyes, and therefore, the custodial statements and evidence subsequently seized from Appellant's vehicle should have been suppressed because they were tainted by his illegal arrest. The State contends that Appellant failed to preserve this issue for review. We agree.

*Preservation of Error*

To preserve a complaint for appellate review, the complaining party must show that the complaint was made to the trial court, by a timely request, objection, or motion that stated the grounds for the ruling with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. TEX.R.APP.P. 33.1(a)(1). The record must also show that the trial court ruled on the request, objection, or motion, either expressly or implicitly. TEX.R.APP.P. 33.1(a)(2). Two purposes are served by requiring a timely, specific objection: (1) to inform the trial court of the basis of the objection and give the judge the opportunity to rule on it, and (2) to give opposing counsel the opportunity to remove the objection or provide other testimony. *Garza v. State*, 126 S.W.3d 79, 82 (Tex.Crim.App. 2004). By affording the trial court an opportunity to rule on an objection, the court is able to decide whether the evidence is admissible. *Id.* If the trial court decides the evidence is inadmissible, the jury is shielded from hearing it. *Id.* Further, the argument raised on appeal must comport with the objection made at trial or it is waived. *Wilson v. State*, 71 S.W.3d 346, 348 (Tex.Crim.App. 2002).

When determining whether a motion to suppress is sufficiently specific to preserve error, we keep in mind that generic or global statements generally do not preserve error for appellate review. *See Swain v. State*, 181 S.W.3d 359, 365 (Tex.Crim.App. 2005)(where defendant made global arguments in motion to suppress that his statements were obtained in violation of his right to counsel and right against self-incrimination, he did not preserve issue on appeal that the police violated his right to counsel by continuing to question him after he requested counsel). "Shotgun" objections, which cite many grounds for the objection without argument and serve only to obscure the specific grounds of the objection, do not preserve a complaint for appellate review. *Johnson v. State*, 263 S.W.3d 287, 289-90 (Tex.App.--Houston [1st Dist.] 2007, pet. dism'd).

Appellant filed a motion seeking to suppress tangible evidence, written and oral statements made to any law enforcement officers, and the testimony of witnesses concerning the evidence and statements, on the following grounds:

> 1. The detention and subsequent arrest of the Defendant were illegal and in violation of the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States and Chapter 14 of the Texas Code of Criminal Procedure.
>
> 2. Any tangible evidence seized in connection with this case was seized without lawful warrant, probable cause or other lawful authority in violation of the Defendant's rights under the Fourth and fourteenth Amendments to the United States Constitution, Article I, Section 9 of the Constitution of the State of Texas, and Chapters 14 and 38 of the Texas Code of Criminal Procedure.
>
> 3. Any statements obtained from Defendant were obtained in violation of Defendant's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 9, 10, and 19 of the Constitution of the State of Texas, and Chapter 14 and Article 38.21, 38.22 and 38.23 of the Texas Code of Criminal Procedure.
>
> 4. Testimony concerning any actions of the Defendant while he/she was under arrest or in detention would be a product of a violation of the Defendant's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 9, 10, and 19 of the Constitution of the State of Texas, and Chapter 14 and Article 38.21, 38.22 and 38.23 of the Texas Code of Criminal Procedure.

Paragraphs 1 through 4 are global in nature and are not sufficiently specific to preserve the issues presented on appeal. Paragraph 1 is the only paragraph which references Appellant's arrest but the generic assertion in Paragraph 1 that his arrest was illegal in violation of the Fourth, Fifth, and Fourteenth Amendments does not put the trial court or opposing counsel on notice that Appellant intended to argue that the affidavit supporting the arrest warrant is insufficient to establish probable cause that he murdered Reyes or that the illegal arrest tainted the evidence seized at the time of Appellant's arrest or the statements he made to the police. *See Swain*, 181 S.W.3d at 365; *Johnson*, 263 S.W.3d at 289-90.

We have also examined the record of the motion to suppress hearing to determine if Appellant preserved his complaints there. At the hearing, Appellant challenged the voluntariness and relevance of his oral and written statements. Additionally, Appellant asserted that his statements were inadmissible because of an alleged delay in taking him before a magistrate after his arrest. At the conclusion of the hearing, Appellant's counsel stated that he was also objecting to the arrest warrant affidavit "as to its sufficiency and probable cause." While this objection raised Appellant's complaint regarding the sufficiency of the search warrant affidavit, he never obtained an adverse ruling on this objection from the trial court. The trial court entered a written order regarding the voluntariness of Appellant's statements but the order does not address the legality of Appellant's arrest. Accordingly, we overrule Issue One.

## APPELLANT'S STATEMENTS

In Issue Two, Appellant argues that his written statement and video-recorded statement should have been suppressed because the statements were taken in violation of his right to counsel guaranteed by the Fifth and Sixth Amendments because he was interrogated without counsel being present. The State maintains that Appellant did not preserve these arguments. We agree.

### *Preservation of Error*

In his motion to suppress, Appellant made the generic assertion that his statements were obtained "in violation of Defendant's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 9, 10, and 19 of the Constitution of the State of Texas, and Chapter 14 and Article 38.21, 38.22 and 38.23 of the Texas Code of Criminal Procedure." His motion did not include any mention of the right to counsel. At the suppression hearing, Appellant challenged the voluntariness and relevance of his oral and written statements. Additionally, Appellant asserted that his statements were inadmissible because of an

alleged delay in taking him before a magistrate after his arrest. In his written memorandum filed with the trial court in support of his motion to suppress, Appellant clearly raised a claim that his statement made on December 5, 2005 should be suppressed because it was taken in violation of his Sixth Amendment right to counsel. When the statements were offered into evidence at trial, Appellant renewed the objections made at the suppression hearing, but he did not assert that his Fifth Amendment right to counsel had been violated. We therefore conclude that Appellant waived his argument based on the Fifth Amendment right to counsel because he did not make a sufficiently specific argument in the trial court. *See* TEX.R.APP.P. 33.1(a)(1). Even if it could be said that Appellant raised the issue in the trial court, he did not obtain an adverse ruling from the trial court on such an objection. *See* TEX.R.APP.P. 33.1(a)(2). Likewise, the record does not reflect that the trial court ruled on the Sixth Amendment right to counsel issue either expressly or impliedly. Consequently, the arguments raised on appeal are waived. *See* TEX.R.APP.P. 33.1(a)(2).

*Delay in Taking Appellant to Magistrate*

In this same issue, Appellant contends that his statements are inadmissible because he was not taken promptly to a magistrate after his initial arrest on December 5 and again on December 14 when he was brought back to El Paso. In support of this argument, Appellant cites Article 14.06 of the Code of Criminal Procedure and *Corley v. United States*, --- U.S. ---, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009). Appellant's reliance on *Corley* is misplaced because *Corley* concerns a federal statute which applies only to prosecutions brought by the United States or by the District of Columbia.

Article 14.06 requires that an arrested person must be taken before a magistrate without unnecessary delay but not later than forty-eight hours after the arrest. TEX.CODE CRIM.PROC.ANN. art. 14.06(a)(West Supp. 2010). Before Detective Samaniego left for Kentucky, Judge Garcia

instructed him to bring Appellant before him immediately upon returning to El Paso. Upon learning that the flight from Kentucky would not arrive in El Paso until midnight, Judge Garcia instructed Samaniego to take Appellant before him the following morning at 9. Detective Samaniego complied with those instructions. Appellant has failed to show that the nine hour day was an unreasonable one. Even if the delay had been unreasonable, it would not vitiate Appellant's otherwise voluntary statements because, as the trial court found in the written findings regarding the voluntariness of Appellant's statements, the police properly advised Appellant of his *Miranda* rights before he gave the statements in question. *See Jones v. State*, 944 S.W.2d 642, 649 (Tex.Crim.App. 1996); *Cantu v. State*, 842 S.W.2d 667, 680 (Tex.Crim.App. 1992). Issue Two is overruled.

## EVIDENCE SEIZED AT TIME OF ARREST

In Issue Three, Appellant argues that the trial court abused its discretion by admitting a photograph of Appellant at the time of his arrest and the evidence seized from Appellant's person and vehicle as well as photographs of this evidence. Appellant maintains that the evidence is inadmissible under Rules 401 and 402 of the Texas Rules of Evidence because it is not relevant. Additionally, he asserts that TEX.R.EVID. 403 precludes admission of the evidence because its probative value is outweighed by the danger of unfair prejudice. He further contends that the evidence was admitted in violation of TEX.R.EVID. 404(b).

The police arrested Appellant in Shepardsville, Kentucky when he arrived at a publishing company for a job interview. A Kentucky detective searched Appellant and seized two knives, a stun gun, and brass knuckles from his person. Appellant consented to a search of his truck. The police found two more knives and parachute cord in the truck. Appellant did not initially object to the testimony about the items found on his person but he raised a relevance objection to a photograph of the items (State's Exhibit 65) and to three photographs of the interior of his truck (State's Exhibits

67, 68, and 70). The trial court overruled that objection and gave him a running objection to the testimony about the search of his truck and the items seized from it. When the State offered into evidence the items shown in the photographs, Appellant again raised a relevance objection. The court overruled the objection.

*Preservation of Error*

Appellant did not state any objection with respect to State's Exhibit 64 (a photograph of Appellant's face), State's Exhibit 66 (a photograph of the exterior of Appellant's vehicle), and State's Exhibit 69 (a photograph of sunglasses in Appellant's vehicle). Consequently, he has waived any issue with respect to these three photographs. TEX.R.APP.P. 33.1(a).

Regarding State's Exhibit 65 (a photograph of the two knifes, stun gun, and brass knuckles seized from Appellant's person) and State's Exhibits 54, 55, 56, and 59 (the actual items), Appellant objected to these exhibits as irrelevant but only after he had permitted Detective Samaniego to testify without objection that the items were seized from Appellant's person at the time of his arrest. To preserve an issue for appellate review, the complaining party must make a timely and specific objection. TEX.R.APP.P. 33.1(a)(1); *Dixon v. State*, 2 S.W.3d 263, 265 (Tex.Crim.App. 1998). An objection is timely when it is made at the earliest possible opportunity. *Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex.Crim.App. 2006). Further, a party must object each time the inadmissible evidence is offered or obtain a running objection. *See Valle v. State*, 109 S.W.3d 500, 509 (Tex.Crim.App. 2003); *Ethington v. State*, 819 S.W.2d 854, 858 (Tex.Crim.App. 1991). By failing to object to Detective Samaniego's testimony about the search and its result, Appellant's subsequent objection to State's Exhibits 54, 55, 56, 59, and 65 was untimely. *See Hill v. State*, 303 S.W.3d 863, 876 (Tex.App.--Fort Worth 2009, pet. ref'd)(defendant did not preserve issue related to admission of photographs of gun seized from his vehicle because he did not object to officers' testimony about

the gun); *Thomas v. State*, 884 S.W.2d 215, 216-17 (Tex.App.--El Paso 1994, pet. ref'd)(defendant's objection to admission of evidence seized from his person was untimely where he objected after allowing police officers to testify, without objection, regarding the search and discovery of syringe containing cocaine residue in his pocket).

With respect to the remaining evidence, Appellant never voiced any objection at trial based on either Rules 403 or 404(b) of the Texas Rules of Evidence. Consequently, those complaints are not preserved for our review. TEX.R.APP.P. 33.1(a).

*Relevance*

The only issue which is preserved is whether the court abused its discretion by overruling Appellant's relevance objection to the items seized from Appellant's truck and the photographs of those items (State's Exhibits 53, 57, 58, 67, 68, and 70). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. Evidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence. *Kirsch v. State*, 306 S.W.3d 738, 743 (Tex.Crim.App. 2010); *Stewart v. State*, 129 S.W.3d 93, 96 (Tex.Crim.App. 2004). Questions of relevance should be left largely to the trial court, relying on its own observations and experience, and we will not reverse absent an abuse of discretion. *Moreno v. State*, 858 S.W.2d 453, 463 (Tex.Crim.App. 1993), *Levario v. State*, 964 S.W.2d 290, 297 (Tex.App.--El Paso 1997, no pet.). A trial court abuses its discretion when its decision is so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex.Crim.App. 2005).

When considered in isolation, evidence that Appellant carried knives in his vehicle in 2005

might at first blush appear irrelevant to the commission of a murder in 1989. As the State points out, however, Appellant admitted in his statement made in 2005 that he had collected knives since he was a child and he carried a knife in his vehicle in 1989 for protection. Thus, the evidence showing that Appellant carried multiple knives on his person and in his vehicle at the time of his arrest is relevant to show Appellant's considerable familiarity with knives and to provide a "small nudge" toward demonstrating his opportunity, means, and capacity to have committed the murder. *See Huffman*, 775 S.W.2d at 661 (where defendant had access to a particular belt, even though it was not conclusively shown to be the murder weapon, the evidence was considered by the court in its sufficiency review as an incriminating circumstance). The trial court did not abuse its discretion by finding the knives recovered from Appellant's vehicle to be relevant.

The State does not argue that the parachute cord is relevant to any material issue in the case, but contends that its admission was harmless. The erroneous admission of evidence is a non-constitutional error subject to the harm analysis found in TEX.R.APP.P. 44.2(b). *Motilla v. State*, 78 S.W.3d 352, 355 (Tex.Crim.App. 2002). Under Rule 44.2(b), a non-constitutional error that does not affect substantial rights must be disregarded. *Rich v. State*, 160 S.W.3d 575, 577 (Tex.Crim.App. 2005). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla*, 78 S.W.3d at 355. When conducting a Rule 44.2(b) harm analysis based upon the erroneous admission of evidence, an appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury instructions, the State's theory and any defensive theories, closing arguments, voir dire, and whether

the State emphasized the error. *Motilla*, 78 S.W.3d at 355-56.

Detective Samaniego described the parachute cord as "some type of ligature" but he was interrupted by Appellant's objection. The State did not pursue the line of questioning and it never asserted that the parachute cord was the murder weapon or that it was illegal to possess it. After its admission, the prosecutors did not mention the evidence again during the trial. Other evidence showed that the ligature actually used to kill the victim may have been the cord from a sweatshirt/hoodie. We conclude that admission of the parachute cord did not influence the jury, and therefore, did not affect Appellant's substantial rights. *See Goldberg v. State*, 95 S.W.3d 345, 366-67 (Tex.App.--Houston [1st Dist.] 2002, pet. ref'd)(in murder prosecution, admission of evidence showing defendant had knives in his car at time of his arrest was harmless because prosecutor did not argue that either of the knives was the murder weapon but instead argued that the defendant had probably disposed of the murder weapon). Issue Three is overruled.

## AUTOPSY PHOTOGRAPHS

In Issue Four, Appellant contends that the trial court abused its discretion by admitting seven autopsy photographs (State's Exhibits 35, 36, 37, 38, 40, 44, and 45) because the photographs were irrelevant and their probative value was substantially outweighed by the danger of unfair prejudice. He argues that admission of the autopsy photographs was unnecessary given that photographs depicting the victim's body at the scene had already been admitted as had the medical examiner's autopsy report. Finally, Appellant asserts that the autopsy photographs amounted to a "gallery of gruesomeness that was only calculated to inflame the jury and compel them to convict on an improper basis."

### Preservation of Error

We first consider whether Appellant preserved his specific complaints that the photographs

were gruesome and inflammatory. In a hearing held outside the presence of the jury, Appellant objected to "all the photographs of the deceased" on relevance and Rule 403 grounds. Stating that the photographs depicted the deceased in a "very compromised position,"[6] Appellant argued that the photographs were irrelevant and prejudicial because they would be cumulative of the medical examiner's report and expected testimony regarding the injuries. After clarifying that Appellant was making a general objection to all of the autopsy photographs, the trial court stated: "All right. I'm going to overrule that objection. But if you have specific objections to specific photos." Appellant replied that he did not have any specific objections at that point.

When the State subsequently offered the autopsy photographs into evidence, Appellant stated more specific objections to the exhibits. Appellant objected to State's Exhibits 35, 36, and 37[7] as irrelevant, cumulative of the photographs of the victim at the scene, and improper bolstering. Appellant objected to State's Exhibit 38 and 40[8] as cumulative of other evidence and irrelevant because the injuries depicted in the exhibits was not the cause of death. Finally, Appellant objected to State's Exhibits 44 and 45 because they were graphic, irrelevant, and prejudicial. Thus, Appellant did not object to any of the exhibits as being gruesome or inflammatory. Therefore, he has waived this part of his argument. TEX.R.APP.P. 33.1(a)(1).

*Relevance*

We review a trial court's decision to admit autopsy photographs under the abuse of discretion standard. *Davis v. State*, 313 S.W.3d 317, 331 (Tex.Crim.App. 2010). A photograph is generally

---

[6] It is not entirely clear what Appellant meant by this statement, but Appellant may have intended to state that two of the photographs depicted the injuries to the victim's vagina.

[7] State's Exhibit 35 is a photograph of the left side of the victim's face. State's Exhibit 36 is a photograph of the right side of the victim's face. State's Exhibit 37 is a photograph of the victim's neck showing the ligature wound.

[8] State's Exhibit 38 is a photograph of the stab wound to the victim's chest. State's Exhibit 40 is a photograph of the stab wound to the victim's back.

admissible if verbal testimony about the matters depicted in the photograph is also admissible. *Young v. State*, 283 S.W.3d 854, 875 (Tex.Crim.App. 2009). A photograph is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Flores v. State*, 299 S.W.3d 843, 857 (Tex.App.--El Paso 2009, pet. ref'd), *quoting* TEX.R. EVID. 401. The identity of the victim, the extent of the victim's injuries, and the manner and means of death are facts that are of consequence to the determination of an action. *Penry v. State*, 903 S.W.2d 715, 751 (Tex.Crim.App. 1995); *Flores*, 299 S.W.3d at 857; *see Williams v. State*, 301 S.W.3d 675, 690-93 (Tex.Crim.App. 2009), *cert. denied*, --- U.S. ---, 130 S.Ct. 3411, 177 L.Ed.2d 326 (2010)(finding that photographs had probative value because they depicted victim's injuries). The State had the burden to prove that Appellant intentionally and knowing caused Reyes' death by strangling her about the neck or by stabbing her body with a knife while in the course of committing and committing aggravated sexual assault. The seven autopsy photographs are relevant to the victim's identity, the extent of her injuries, including the ligature wound and the stab wounds to her torso and vagina, the occurrence of an aggravated sexual assault, and the cause of death. The fact that the jury had also heard testimony regarding the injuries depicted does not reduce the relevance of the visual depiction. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex.Crim.App. 2006).

### *Rule 403*

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. TEX.R.EVID. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Shuffield*, 189 S.W.3d at 787. The term "probative value"

refers to the inherent probative force of an item of evidence--that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation--coupled with the proponent's need for that item of evidence. *Casey v. State*, 215 S.W.3d 870, 879 (Tex.Crim.App. 2007); *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex.Crim.App. 2006). When conducting the balancing test under Rule 403, the trial court determines whether the probative value of the evidence is substantially outweighed by one or more of the countervailing considerations listed in the rule. *Casey*, 215 S.W.3d at 880. A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case. *Davis*, 313 S.W.3d at 331; *Flores*, 299 S.W.3d at 858.

State's Exhibits 35 and 36 depict the victim's face and head. No injuries are visible in the photos. As the prosecutor explained during trial, the photos show the victim's curly hair which could not be clearly seen in other photographs of her at the scene. The photos allowed the jury to compare Appellant's description of the victim in his video-recorded statement with the photographs. The trial court did not abuse its discretion by overruling Appellant's Rule 403 objection.

State's Exhibit 37 shows the external ligature wound and bruising on the victim's neck and is not gruesome. This is the only photograph which shows the ligature wound. The photograph aided the jury in understanding and evaluating the medical examiner's testimony that the ligature wound was quite narrow and could have been caused by a thin cord. Appellant argues that this exhibit is inadmissible because it is cumulative of the medical examiner's testimony. The Court of Criminal Appeals has rejected the premise that visual evidence accompanying oral testimony is

cumulative of the testimony or that it is of insignificant probative value. *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex.Crim.App. 1999). Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions. *Id.* We find that the photograph possessed substantial probative value and it was not outweighed by the danger of unfair prejudice or by the needless presentation of cumulative evidence.

State's Exhibit 38 depicts a single stab wound to Reyes' chest and it bears the medical examiner's case number. While photos taken at the scene show the same wound from different angles, the photo is not gruesome. As the prosecutor explained to the trial court, the medical examiner utilized this photograph to show that it's the same victim and same injury depicted in a close-up of the wound in State's Exhibit 31 and discussed in the autopsy report. The trial court did not abuse its discretion by admitting the exhibit. *See Young*, 283 S.W.3d at 875 (autopsy identification photo admissible because it ensured the autopsy report would correspond to the photo of the correct victim).

State's Exhibit 40 shows the stab wound to Reyes' flank with a ruler next to the wound. Like State's Exhibit 38, this exhibit also includes the case number placard. The same wound is visible in State's Exhibit 78 which is an overall anterior view of the victim taken at the crime scene from a distance of several feet, but State's Exhibit 38 presents a considerably better view of the wound and its size. State's Exhibit 38 is an aid to understanding the nature of the victim's wound and the jury could compare it against the medical examiner's testimony that the wound was caused by a knife. *See Chamberlain*, 998 S.W.2d at 237. The trial court did not abuse its discretion by overruling Appellant's objections to this exhibit. *See Williams*, 301 S.W.3d at 690-93.

State's Exhibits 44 and 45 depict the gruesome stab injuries to the victim's vagina. In the

photographs, the medical examiner has spread apart the victim's legs in order to visualize the wounds. The medical examiner testified that the victim suffered multiple stab wounds to the vagina caused by a knife. One of the wounds was deep and penetrated the vaginal wall while five other wounds were more superficial. The exhibits in question were not cumulative because no other photographs showed the vaginal wounds. While the exhibits are certainly gruesome, they portray nothing more than the gruesomeness of the injuries inflicted by Appellant. *Williams*, 301 S.W.3d at 691. The trial court did not abuse its discretion by overruling Appellant's objection to these exhibits. Issue Four is overruled.

## HEARSAY

In Issue Five, Appellant argues that the trial court abused its discretion by not permitting him to cross-examine Detective Samaniego about statements allegedly made by Michael Daley during the investigation. Appellant maintains that the error deprived him of the ability to present a defense.

Outside of the jury's presence, Appellant's attorney asserted that Daley had made an admission to police that he was the last person to see the victim alive, he had attempted to have sex with her, and he "threw her out" when she refused. The prosecutor responded that the police had never spoken to Daley and he had never made these statements to the police. The prosecutor explained that a police supplement reflected that the statements attributed to Daley was fourth-hand hearsay[9] and the police had never talked to him. The trial court asked defense counsel if Daley had ever talked to Detective Samaniego and counsel replied that he did not know if the police had ever talked to Daley. Upon hearing this, the court sustained the State's hearsay objection. In the jury's presence, defense counsel asked Samaniego whether he recalled reading information that someone

---

[9] According to the prosecutor, the supplement said, "My cousin's sister's mother's father's best friend says he said this."

else had seen the deceased or had the deceased in his apartment that night. The trial court sustained the State's hearsay objection.

A criminal defendant has a constitutional right to present a complete defense. *Miller v. State*, 36 S.W.3d 503, 506 (Tex.Crim.App. 2001), *citing Gilmore v. Taylor*, 508 U.S. 333, 343, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993); *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). A defendant has a fundamental right to present evidence of a defense as long as the evidence is relevant and is not excluded by an established evidentiary rule. *Miller*, 36 S.W.3d at 507. We will review the trial court's decision to exclude for an abuse of discretion. *Id.*

"Hearsay" is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. TEX.R.EVID. 801(d). Hearsay is not admissible except as provided by statute, the rules of evidence, or a rule promulgated pursuant to statutory authority. TEX.R.EVID. 802. Appellant contends that Daley's alleged statements are not hearsay because they were not offered for the truth of the matter asserted but were instead offered to support "Appellant's claimed defense, i.e., that he did not commit the murder of the victim in this case." Contrary to Appellant's claim on appeal, the statements could not provide Appellant with a defense to the capital murder charge unless the jury believed the statements. In other words, the statements were offered to prove that Daley, not Appellant, was the last person to see Reyes alive.

Appellant did not attempt to show in the trial court and he does not argue on appeal that the statements were admissible pursuant to some exception to the hearsay rule. Accordingly, we find that the trial court did not abuse its discretion by excluding this hearsay evidence. Issue Five is overruled. Having overruled each issue presented on appeal, we affirm the judgment of the trial court.

July 29, 2011

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)